# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Coghlan v. Beck*, 2013 IL App (1st) 120891

---

| | |
|---|---|
| Appellate Court Caption | ANGELIKA COGHLAN, an Individual; and CATWALK CONSULTING, INCORPORATED, an Illinois Corporation, Plaintiffs-Appellants, v. VALERIE BECK, an Individual; REBECCA S. BUSCH, an Individual; MEDICAL BUSINESS ASSOCIATES, INC., an Illinois Corporation; NATIONAL ASSOCIATION OF WOMEN BUSINESS OWNERS-CHICAGO CHAPTER, an Illinois Not-For-Profit Corporation; and NATIONAL ASSOCIATION OF WOMEN BUSINESS OWNERS, INC., a District of Columbia Not-For-Profit Corporation, Defendants-Appellees. |
| District & No. | First District, First Division<br>Docket No. 1-12-0891 |
| Filed | January 22, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The dismissal of plaintiff's claims of breach of contract, defamation, and civil conspiracy to commit libel was upheld on the grounds that the allegations in the complaint and attached exhibits negated the breach of contract claim, the defamation allegations were conclusory, the statements at issue were not defamatory but, rather, were privileged and subject to innocent constructions, and no underlying tort was properly alleged. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-16630; the Hon. Kathleen M. Pantle, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Fuksa Khorshid, LLC, of Chicago (Thomas D. Carroll, Lema A. Khorshid, and Robert J. Schaul, of counsel), for appellants.

Pretzel & Stouffer, Chtrd. (Robert Marc Chemers, Richard M. Warris, Matthew F. Tibble, and David J. Stein, of counsel), Hinshaw & Culbertson LLP (David H. Levitt, Stephen R. Swofford, and Leigh C. Bonsall, of counsel), Tabet DiVito & Rothstein LLC (Mark H. Horwitch, John M. Fitzgerald, and Mili R. Joseph, of counsel), and SmithAmundsen LLC (Michael Resis and Ryan B. Jacobson, of counsel), all of Chicago, for appellees.

Panel

JUSTICE DELORT delivered the judgment of the court, with opinion.

Presiding Justice Hoffman and Justice Cunningham concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiffs, Angelika Coghlan and Catwalk Consulting, Inc. (Catwalk), filed a nine-count amended complaint against Valerie Beck, Rebecca Busch, Medical Business Associates, Inc. (MBA), the National Association of Women Business Owners, Inc. (NAWBO), and the National Association of Women Business Owners-Chicago Chapter (NAWBO-Chicago) (collectively, defendants). Plaintiffs alleged breach of contract, libel *per se*, slander *per se*, and civil conspiracy. The trial court granted defendants' motions to dismiss brought under sections 2-615 and 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615, 2-619.1 (West 2010)). On appeal, plaintiffs contend that the trial court erred in (i) finding that plaintiffs' exhibits to the complaint defeated their breach of contract claim (count I); (ii) dismissing plaintiffs' claims of libel *per se* and slander *per se* against Beck (counts II, III, and VIII); (iii) dismissing their claim for conspiracy to commit libel *per se* against Beck and Busch (count V); (iv) finding that Busch's statements in a letter either were subject to a qualified privilege that plaintiffs' allegations did not overcome or were capable of an innocent construction (count IV); (v) finding that Beck's actions were privileged and certain claims against NAWBO-Chicago were not sufficiently specific to determine the nature of the defamatory act (counts VI, VII, and IX); and (vi) dismissing their claim alleging vicarious liability against NAWBO (counts VI, VII, and IX). We affirm.

¶ 2                              BACKGROUND

¶ 3    Angelika Coghlan was the managing partner of Catwalk, an information technology services company. NAWBO is an organization dedicated both to encourage women to own businesses and to support women business owners. NAWBO-Chicago is a local chapter of

NAWBO. Coghlan has been a member of NAWBO-Chicago since April 1999 and a member of its board of directors since 2005. In addition, Coghlan served as NAWBO-Chicago's president from July 2008 to June 2010, at which point Valerie Beck became the president. Rebecca Busch was the chief executive officer of MBA and a member of NAWBO-Chicago. Among the services NAWBO-Chicago provides to its members is access to a "listserv," whereby members may post information onto NAWBO-Chicago's Internet messaging board, such as requests for business proposals, advice, or employment. Coghlan, as president of NAWBO-Chicago, was the moderator of the listserv.

¶ 4    Around January 4, 2010, Busch submitted a posting to NAWBO-Chicago's listserv seeking information technology services for her company, MBA. Coghlan reviewed Busch's submission, but before posting it publicly onto NAWBO-Chicago's listserv, Coghlan called Busch because Coghlan believed that her company, Catwalk, might be able to provide the services Busch was seeking for MBA. Coghlan and Busch discussed the opportunity during the call and arranged a meeting in person for February 4, 2010. Coghlan alleged in her first amended complaint that she posted Busch's submission onto the listserv (thus rendering it immediately accessible to all of NAWBO-Chicago's members) before ending the call with Busch.

¶ 5    Following various in-person meetings, Coghlan and Busch entered into a written contract. The contract comprised two sections, the "Agreement," and the "Health$hield Implementation Plan" (the Plan). The Agreement provided in pertinent part that fees and payment terms were "[t]o be determined," the agreement could not be changed or terminated orally, and all modifications had to be in writing and agreed to by both parties. Finally, the Agreement indicated that either party could cancel it by providing 30 days' written notice, and that no compensation, reimbursements or damages would be paid, but that "any and all amounts due and payable up to the date of termination shall be paid in accordance with this Agreement."

¶ 6    The Plan, bearing a copyright in the name of Catwalk, described the contract's scope and terms related to the project. In the plan, the "Fees" section stated that the various resources assigned to the project would have billing rates of between $90/hour to $150/hour but that "the blended rate [would] be targeted at $115/hour." The following provision immediately followed:

> "In order to provide you with the opportunity to plan for the associated costs of this project, we have outlined the resource costs in Figure 1 ***. The resource costs were calculated using the standard number of working days for the period."

¶ 7    Under a subsection entitled, "Potential Timeline and Resource Requirements," Catwalk indicated that its time line "in no way implies a commitment to meet this schedule." Various tasks were then listed along with a "Low End" and "High End" number of days to complete the task. Figure 1, entitled "Detailed Resource Costs," consisted of a table listing various tasks, the Low End costs (totaling $93,380), and the High End costs (totaling $110,400).

¶ 8    Finally, the Plan included an "Assumptions" section, providing in relevant part that, if Catwalk determined that an assumption was no longer valid and would affect the completion of the "deliverables," then Catwalk would "raise it as an issue and work with MBA to arrive

at a mutually acceptable resolution." One of the assumptions was that changes to the scope would result in a delay of the project schedule.

¶ 9    Through January 14, 2011, Catwalk received $110,400 in payments on behalf of MBA. On March 21, 2011, Busch notified Catwalk of MBA's intention to terminate the contract. Catwalk immediately ceased all activities on behalf of MBA and sent MBA an invoice dated March 25, 2011, for $42,550.

¶ 10   On April 6, 2011, NAWBO-Chicago held a monthly meeting of its board of directors. In advance of the meeting, Beck prepared a written statement claiming that Coghlan: (1) is a "corrupt Director [who] must indeed go," (2) "intercepted a listserv posting for her own benefit, which is indeed a classic conflict of interest," (3) "gave away proprietary NAWBO information," (4) "induced [Busch] to contract with her and to take out a loan for $100,000," (5) "pocketed the money," (6) "failed to give the deliverable that was contracted for," (7) "used bully tactics to try to gain yet more money," (8) was "using NAWBO to operate a fraud machine," (9) used "smokescreen tactics to conceal this wrongdoing," and (10) is an "offending Director."

¶ 11   Attached to the letter were various e-mails and other documents. One document, entitled "Board Principles of Operations: Conflict of Interest" for NAWBO, provides that board members should avoid conflicts of interest, *inter alia*, by placing "the interests of the general membership and the board over and above personal professional and political interests as a director of the board" and by refusing to "secure special services, favors, honoraria or exemptions that are not available to the general membership." In addition, an e-mail dated March 8, 2011, from Busch to Beck indicates that Coghlan sent to Busch and one of MBA's employees a list of people who had attended "NAWBO Day" and a membership list, with the following comment from Coghlan: "If anyone ever asks about the list you didn't get it from me. :)"

¶ 12   Immediately prior to the meeting, Beck told Coghlan that Beck planned to inform the other NAWBO-Chicago board members of the contents of the statement. During the meeting, Beck distributed a copy of the written statement and attachments to every member of NAWBO-Chicago's board. Coghlan did not consent to the distribution. In addition, Beck repeated some of the comments in the written statement.

¶ 13   On April 22, 2011, Busch sent a letter signed by her to the Global Financing Division of International Business Machines Corporation (IBM). In the letter, Busch stated that her company "financed $100,000 worth of work" through Catwalk, an "IBM Business Partner," and that although Catwalk had been "paid in full for the contracted services," it had not provided "the contracted deliverable." According to Busch, Catwalk refused to return MBA's intellectual property and attempted to sell that property as well as a portion of MBA's program. Busch noted that a portion of its intellectual property still being held by Catwalk might include individually identifiable information subject to "HIPAA statu[t]es." Busch then informed IBM that both it and NAWBO "share in this exposure since Ms. Coghlan used both organizations and continues to use IBM as a conduit to continue her misrepresentations along with the current pending theft of MBA property."

¶ 14   Plaintiffs subsequently filed a nine-count verified first amended complaint. Count I

-4-

alleged breach of contract against MBA for its failure to pay the $42,550 that plaintiffs alleged Catwalk was owed. Count II alleged libel *per se* against Beck for the written statement that she distributed to the NAWBO-Chicago board members, and count III alleged slander *per se* against Beck because she allegedly "repeated some and/or all of the defamatory statements" in the written statement. Plaintiffs asserted that the statements were unprivileged and related to plaintiffs' inability to perform professional or business duties, reflected negatively on plaintiffs' professional reputation, and "impute onto Plaintiffs the commission of a criminal offense."

¶ 15    Count IV alleged libel *per se* against Busch based upon her April 22, 2011, letter to IBM, specifically, the statement in the letter that Coghlan used IBM and NAWBO "as a conduit to continue her misrepresentations along with the current pending theft of MBA property." Plaintiffs asserted, similarly to count III, that the statement was defamatory *per se* because it related to plaintiffs' inability to perform professional or business duties, reflected negatively on plaintiffs' professional reputation, and "imputes onto Plaintiffs the commission of a criminal offense."

¶ 16    Count V claimed that Beck and Busch conspired to commit libel *per se* based upon their sharing of information, working together to prepare both the written statement-knowing it contained false information-as well as the letter to IBM, and having Beck distribute the statement at the NAWBO-Chicago board meeting. Plaintiffs argued that Beck and Busch acted willfully or maliciously because they both knew that the statements in the written statement and the letter to IBM were false but published them nonetheless in order to "negatively impact" the professional reputations of plaintiffs.

¶ 17    Counts VI and VIII of the first amended complaint alleged, respectively, libel *per se* and slander *per se* against both NAWBO-Chicago and NAWBO. Both counts asserted that Beck, as president of NAWBO-Chicago, was its agent as well as an agent of NAWBO. Count VI then claimed that NAWBO-Chicago and NAWBO committed libel *per se* when Beck committed the acts alleged in count II, whereas count VII claimed that both entities committed slander *per se* based upon Beck's actions as described in count III.

¶ 18    Count VIII alleged another claim of libel *per se* against Beck based upon Beck's alleged sending of an e-mail on May 3, 2011, to several members of the NAWBO-Chicago board that included a copy of the letter to IBM. Plaintiffs stated that Beck acted willfully or maliciously because she knew the statements in the letter were false but published them regardless to hurt plaintiffs' professional reputations. Finally, count IX alleged that NAWBO and NAWBO-Chicago committed libel *per se* based upon Beck's actions as alleged in count VIII and because, as president of NAWBO-Chicago, she was an agent of both entities.

¶ 19    Defendants filed motions to dismiss under sections 2-615 and 2-619.1 of the Code. On February 24, 2012, the trial court issued a detailed written order granting defendants' motions and dismissing the cause with prejudice. The trial court's order found that the breach of contract claim was negated by the exhibits attached to plaintiffs' complaint. Regarding the defamation claims, the trial court found plaintiffs' allegations to be conclusory, and that the statements at issue were either substantially true, were nonactionable opinion, or were subject to a qualified privilege that plaintiffs failed to overcome. Finally, the trial court found that

the civil conspiracy claim was subject to dismissal because the allegations were conclusory and the underlying tort had been dismissed. Plaintiffs did not seek leave to file a second amended complaint. This timely appeal followed.

¶ 20                                                   ANALYSIS

¶ 21                    Motions to Dismiss Under Sections 2-615 and 2-619.1 of the Code

¶ 22        "To survive a motion to dismiss pursuant to section 2-615, a complaint must be both legally and factually sufficient." *Edelman, Combs & Latturner v. Hinshaw & Culbertson*, 338 Ill. App. 3d 156, 167 (2003). "Illinois is a fact-pleading jurisdiction." *Id.* (citing *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 426-27 (1981)). Although both sections 2-603(c) and 2-612(b) of the Code (735 ILCS 5/2-603(c), 2-612(b) (West 2010)) mandate the liberal construction of pleadings, these provisions do not authorize notice pleading. *Knox*, 88 Ill. 2d at 426-27. Conclusions of fact are insufficient to state a cause of action regardless of whether they generally inform the defendant of the nature of the claim against him. *Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill. 2d 497, 519-20 (1989). Rather, under Illinois fact pleading, the pleader is required to set out ultimate facts that support his or her cause of action. *People ex rel. Fahner v. Carriage Way West, Inc.*, 88 Ill. 2d 300, 308 (1981).

¶ 23        By contrast, section 2-619 provides for involuntary dismissal based upon certain defects or defenses, and if the grounds for dismissal are not apparent on the face of the pleading, "the motion shall be supported by affidavit." 735 ILCS 5/2-619 (West 2010). Section 2-619(a)(9) of the Code permits involuntary dismissal of a claim where the claim is barred by other affirmative matters defeating or avoiding the legal effect of the claim, such as a claim of privilege. 735 ILCS 5/2-619(a)(9) (West 2010); *Edelman, Combs & Latturner*, 338 Ill. App. 3d at 164.

¶ 24        Section 2-619.1 of the Code permits a party to combine a section 2-615 motion to dismiss based upon a plaintiff's substantially insufficient pleadings with a section 2-619 motion to dismiss based upon certain defects or defenses. 735 ILCS 5/2-619.1 (West 2010); *Edelman, Combs & Latturner*, 338 Ill. App. 3d at 164. When ruling on a motion to dismiss under either section 2-615 or section 2-619, a court must accept all well-pleaded facts in the complaint as true and draw all reasonable inferences from those facts in favor of the nonmoving party. *Id.* As a result, a motion to dismiss pursuant to either section should not be granted unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006) (section 2-615); *Snyder v. Heidelberger*, 2011 IL 111052, ¶ 8 (section 2-619). Additionally, unless they are the product of mistake or inadvertence, a party's admissions contained in an original verified pleading are judicial admissions that bind the pleader throughout the litigation, even after the filing of an amended pleading that supercedes the original. *Konstant Products, Inc. v. Liberty Mutual Fire Insurance Co.*, 401 Ill. App. 3d 83, 86 (2010). Furthermore, it is well established that exhibits attached to a complaint become a part of a complaint, and if there is any conflict between the factual matters in the exhibits and those alleged in the complaint, the factual matters in the exhibit control. *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 114 Ill. 2d 278, 287 (1986) ("Where an exhibit is the instrument being sued upon, it

controls over the facts alleged in the complaint" (citing *Fowley v. Braden*, 4 Ill. 2d 355, 359-60 (1954))). We review *de novo* the trial court's decision on motions to dismiss brought under both sections 2-615 and 2-619. *Edelman, Combs & Latturner*, 338 Ill. App. 3d at 164. Finally, this court reviews the judgment, not the reasoning, of the trial court, and we may affirm on any grounds in the record, regardless of whether the trial court relied on those grounds or whether the trial court's reasoning was correct. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995).

¶ 25                            The Breach of Contract Claim (Count I)

¶ 26      Plaintiffs contend that the trial court erred in dismissing their breach of contract claim against MBA. First, they argue that the plain language of the contract indicates that the Low End and High End total costs provided in the Plan were cost estimates. Second, they argue that any ambiguity in the contract should have been resolved in their favor at the pleading stage. For the following reasons, we reject plaintiffs' contentions.

¶ 27      The essential elements of a breach of contract are as follows: (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) resultant injury to the plaintiff. *Gallagher Corp. v. Russ*, 309 Ill. App. 3d 192, 199 (1999). The terms of an agreement, if unambiguous, should generally be enforced as they appear, and those terms will control the rights of the parties. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479 (1998). In addition, any ambiguity in the terms of a contract must be resolved against the drafter of the disputed provision. *Id.*

¶ 28      In this case, plaintiffs note that the project costs are based upon a blended $115/hour rate and a Low End and High End time schedule to complete various tasks related to the project. Plaintiffs also note that the Plan included a statement that Catwalk was not bound to meeting the schedule. Thus, according to plaintiffs, the plain language of the contract indicates that the Low End and High End costs were merely an "estimate" of the total costs of completion. We disagree.

¶ 29      The contract that Catwalk authored explicitly provided a Low End and High End "Detailed Resource Cost" that MBA would have to pay, so that MBA could "plan for the associated costs of this project." Catwalk admitted receiving $110,400–the High End cost that Catwalk itself calculated. In addition, Catwalk's contract contained a provision that any changes to the contract that would alter that range of costs had to be agreed to in writing by both parties, but no such written modifications were signed by either party. Finally, although Catwalk stated that it immediately ceased working on the project when MBA provided its notice of cancellation, Catwalk failed to provide any facts supporting its claim that MBA owed an additional $42,550 above the High End cost Catwalk had calculated. On these facts, Catwalk failed to allege a breach of any sort on the part of MBA or Busch for their failure to pay the additional $42,550.

¶ 30      Nonetheless, plaintiffs argue that alterations in project scope were contemplated under the contract and would therefore not constitute a modification requiring the written approval of MBA and Catwalk because (i) its fees were listed as "to be determined," (ii) the contract included a provision that Catwalk was not bound to meet any particular schedule, and (iii)

the contract indicated an assumption that changes in scope would delay the project schedule. The range of costs and their associated time frames that Catwalk provided in its contract, however, explain why its precise fees and time line were undetermined. Furthermore, while the contract's assumption that changes in scope would delay the project *schedule*, the assumption did not address the effect changes in scope will have on the total *cost* of the project. Although changes in scope would likely have affected the completion date of the project, either lengthening or shortening it, those changes would not necessarily affect the total cost of the project. Plaintiffs' argument is therefore meritless.

¶ 31    Alternatively, plaintiffs argue that any ambiguities in either the contract or the pleadings must be resolved in their favor at this stage. Busch and MBA respond that this issue is forfeited because plaintiffs failed to raise this issue before the trial court. *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 229 (1986). Even if plaintiffs had not forfeited this claim, it still would fail.

¶ 32    In support of their claim that any ambiguities in the contract must be resolved in their favor at this stage, plaintiffs cite *Chicago Investment Corp. v. Dolins*, 93 Ill. App. 3d 971, 974 (1981). Plaintiffs' reliance upon *Chicago Investment Corp.*, however, is misplaced. There, the court did not hold that the interpretation of an ambiguous contract is a question of fact. Rather, the court held that, to determine "whether a document which is alleged to be a contract *** is such an enforceable agreement, the court must determine the intent of the parties to the document." *Id.* The court then proceeded to note that, if the language of the document is ambiguous, "the determination of its meaning is a question of fact." *Id.* The court also stated that the determination of whether a document's language is ambiguous is a matter of law. *Id.* Here, the parties do not disagree as to whether the Agreement and Plan comprise a contract. They disagree as to the terms of what they concede is a contract. Thus, *Chicago Investment Corp.* is unavailing.

¶ 33    In this case, the trial court did not find the terms of the contract to be ambiguous. As discussed above, we agree with the trial court's conclusion. Plaintiffs, however, question why MBA and Busch would have canceled the contract despite paying what MBA and Busch claim is the maximum amount due under the contract. Plaintiffs' pleadings and exhibits, however, provide the answer. IBM, which classified Catwalk as its preferred vendor, provided $100,000 in financing to MBA for the project, and in turn MBA repaid IBM. Busch's March 2, 2011, e-mail to Michael Coghlan, a Catwalk employee, indicated that Catwalk had been paid in full, but that MBA would not pay IBM's March invoice or discuss any contract modifications until it received the "deliverable" from Catwalk. Thus, Catwalk received the bulk of the High End project costs from IBM, and MBA was refusing to repay the final portion of the IBM loan until Catwalk completed the project. Thus, plaintiffs' question does not advance their claim that the contract terms are ambiguous.

¶ 34    In any event, as noted above, any ambiguities in a contract are to be construed against the drafter. *Dowd & Dowd, Ltd.*, 181 Ill. 2d at 479. Therefore, even assuming, *arguendo*, that the contract is ambiguous as to whether the High End cost is an estimate or a fixed cap, that ambiguity must be resolved against plaintiffs (the drafter) and in favor of MBA.

¶ 35    In addition, plaintiffs' claim that ambiguities in their pleadings must be resolved in their

favor at this stage is without merit. Plaintiffs are correct that, when ruling on a motion to dismiss under section 2-615, a court must accept all well-pleaded facts in the complaint as true and draw all reasonable inferences from those facts in favor of the nonmoving party. *Edelman, Combs & Latturner*, 338 Ill. App. 3d at 164. Because Illinois is a fact-pleading state, however, bare conclusions of law or conclusory factual allegations unsupported by specific facts are not deemed admitted for the purposes of a section 2-615 motion to dismiss. *Time Savers, Inc. v. LaSalle Bank, N.A.*, 371 Ill. App. 3d 759, 767 (2007). Thus, to the extent plaintiffs' pleadings are ambiguous, they are insufficient under Illinois law, and the trial court properly dismissed count I.

¶ 36                          The Claims of Libel *Per Se* and Slander *Per Se*
                              Against Beck (Counts II, III, and VIII)

¶ 37    Plaintiffs next argue that the trial court erred in granting Beck's section 2-619.1 motion to dismiss the claims of libel *per se* and slander *per se* against Beck. Plaintiffs first challenge the trial court's determination that Beck's statements that Coghlan engaged in a conflict of interest and improperly disclosed NAWBO-Chicago's proprietary information were substantially true. Plaintiffs then claim the trial court erred in finding that Beck's other statements in her written statement were either opinions or capable of an innocent construction. Finally, plaintiffs claim the trial court erred in finding that they failed to plead their allegation in count VIII with sufficient specificity.

¶ 38    Both libel and slander fall under the general rubric of defamation. Black's Law Dictionary 934, 1421 (8th ed. 2004). In addition, libel and slander are treated alike and the same rules apply to a defamatory statement regardless of whether the statement is written or oral. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 89 (1996). To state a defamation claim, a plaintiff must present sufficient facts establishing that (1) the defendant made a false statement about the plaintiff, (2) the defendant made an unprivileged publication of that statement to a third party, and (3) this publication caused damages. *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). A defamatory statement is one that harms the plaintiff's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him. *Id.* The preliminary construction of an allegedly defamatory statement is a question of law. *Id.* at 492.

¶ 39    A statement is defamatory *per se* if the harm is "obvious and apparent on its face." *Id.* at 491. The supreme court has recognized five categories of statements that are considered defamatory *per se*, three of which are relevant here: "(1) words that impute a person has committed a crime; *** (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; [and] (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession." *Id.* at 491-92. A claim of defamation *per se*, however, must be pled "with a heightened level of precision and particularity." *Id.* at 495.

¶ 40    It should also be noted that "[o]nly statements capable of being proven true or false are actionable; opinions are not." *Moriarty v. Greene*, 315 Ill. App. 3d 225, 233 (2000) (citing *Kirchner v. Greene*, 294 Ill. App. 3d 672, 680-81 (1998)). Specifically, the first amendment

prohibits defamation actions based on loose, figurative language that no reasonable person would believe presented facts. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 397-98 (2008) (citing *Troy Group, Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1157 (C.D. Cal. 2005) (defendant's characterization of parties associated with plaintiff "as the biggest crooks on the planet" not actionable because, viewed in context, it was exaggerated, figurative and hyperbolic speech protected by the first amendment), *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 129 (1st Cir. 1997) (defendant's reference to competitor as "trashy" not actionable), *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 284-86 (1974) (use of the word "traitor" to define a worker who crossed a picket line not actionable), *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970) (characterization of a developer's negotiating position as "blackmail" not defamatory and under the circumstances did not suggest commission of a crime), and *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 (1st Cir. 1992) (calling play " 'a rip-off, a fraud, a scandal, a snake-oil job' " was mere hyperbole and, thus, constitutionally protected)). To determine whether a statement is protected from defamation claims under the first amendment, one must determine whether it can reasonably be interpreted as stating actual fact from the perspective of an ordinary reader. *Imperial Apparel, Ltd.*, 227 Ill. 2d at 398. The following criteria are considered in applying this test: (1) whether the statement has a precise and readily understood meaning, (2) whether the statement is verifiable, and (3) whether the statement's literary or social context signals that it has factual content. *Id.*

¶ 41 In addition, even statements that fall into one of the categories of words that are defamatory *per se* are not actionable *per se* if they can be reasonably capable of an innocent construction. *Green*, 234 Ill. 2d at 499. Under the innocent-construction rule, a court must consider the statement in context and give its words, and any implications arising from them, their natural and obvious meaning. *Id.* While a court "should not strain to see an inoffensive gloss" where the defendant "clearly intended and unmistakably conveyed a defamatory meaning," if the statement in context is reasonably capable of a nondefamatory interpretation, it should be interpreted as such. *Id.* at 500.

¶ 42 Another defense to a defamation action is where the statements at issue are substantially true. *Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 563 (2003). The " 'substantial truth' " is shown where the " 'gist' " or " 'sting' " of the allegedly defamatory material is true. *Id.* (quoting *Lemons v. Chronicle Publishing Co.*, 253 Ill. App. 3d 888, 890 (1993)). "While determining 'substantial truth' is normally a question for the jury, the question is one of law where no reasonable jury could find that substantial truth had not been established." *Moore v. People for the Ethical Treatment of Animals, Inc.*, 402 Ill. App. 3d 62, 71 (2010) (quoting *Wynne v. Loyola University of Chicago*, 318 Ill. App. 3d 443, 451-52 (2000)), *appeal denied*, 237 Ill. 2d 560 (2010). In addition, it is important to note that allegedly defamatory material is not actionable even where it is not technically accurate in every detail. *Id.*

¶ 43 Finally, a defamatory statement is not actionable where it is subject to a privilege. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 585 (2006). There are two types of privileges: absolute and qualified. *Id.* To determine whether a qualified privilege exists, a court "looks only to the occasion itself for the communication and determines as a

matter of law and general policy whether the occasion created some recognized duty or interest to make the communication so as to make it privileged." *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 27 (1993). One such occasion includes "situations that involve some interest of the party publishing the statement, such as a corporate employer investigating certain conduct by its employees." *Popko v. Continental Casualty Co.*, 355 Ill. App. 3d 257, 264 (2005). "A corporation has an unquestionable interest in investigating and correcting a situation where one of its employees may be engaged in suspicious conduct within the company. [Citation.] Thus, a qualified privilege exists for communication made concerning such investigation." *Id.* Once a defendant has established a qualified privilege, the plaintiff must then prove that the defendant either intentionally published the material while knowing the matter was false, or displayed a "reckless disregard" as to the matter's falseness. *Kuwik*, 156 Ill. 2d at 24. Reckless disregard is defined as publishing the defamatory matter " 'despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth.' " *Id.* at 24-25 (quoting *Mittelman v. Witous*, 135 Ill. 2d 220, 237-38 (1989)). "This burden is not satisfied by the bare allegation that a defendant acted maliciously and with knowledge of the falsity of the statement; the plaintiff must allege facts from which actual malice may be inferred." *Davis v. John Crane, Inc.*, 261 Ill. App. 3d 419, 431 (1994).

¶ 44    Here, plaintiffs contend the trial court erred in finding that two of Beck's statements were substantially true. The first statement concerns Beck's statement that Coghlan engaged in a "classic conflict of interest" when she intercepted Busch's listserv submission for her own benefit. The second involves Beck's statement that Coghlan improperly distributed NAWBO-Chicago's proprietary information when Coghlan distributed the membership list of NAWBO-Chicago and the list of attendees at a function sponsored by NAWBO-Chicago.

¶ 45    As to the first statement, the gist or sting of Beck's conflict of interest statement was that Coghlan intercepted Busch's submission and contacted Busch to offer Catwalk's (Coghlan's company's) services prior to making that submission available to the entire membership. Plaintiffs, however, alleged in their verified first amended complaint that Coghlan did just that: as moderator of the listserv service, Coghlan received Busch's submission and contacted her prior to posting the submission on the listserv, where it would be immediately accessible to all NAWBO-Chicago members. Plaintiffs' allegation constitutes a binding judicial admission and establishes the substantial truth of Beck's statement. *Konstant Products, Inc.*, 401 Ill. App. 3d at 86.

¶ 46    Similarly, the substantial truth of Beck's statement regarding Coghlan's distribution of proprietary information is established in an exhibit to plaintiffs' complaint. In that exhibit, Coghlan sent the membership list of NAWBO-Chicago as well as a list of attendees of "NAWBO Day" to Busch and another employee of MBA. At the end of Coghlan's e-mail is the statement, "If anyone ever asks about the list you didn't get it from me." The unmistakable inference from Coghlan's statement is that she knew she was not authorized

to distribute that information.[1] Again, where factual matters in an exhibit contradict those in the complaint, the exhibit controls. *Charles Hester Enterprises, Inc.*, 114 Ill. 2d at 287. Accordingly, on these facts, we find that no reasonable jury would have found that the substantial truth had not been established. *Moore*, 402 Ill. App. 3d at 71.

¶ 47       The trial court order also found Beck's statement that Coghlan's actions were a classic conflict of interest to be substantially true. We have not found an Illinois case holding whether an allegation that someone engaged in a conflict of interest is actionable in a defamation action. To be sure, some conflicts of interest are crimes, and a false allegation under such circumstances would impute the commission of a specific crime and be actionable as defamation *per se*. *Green*, 234 Ill. 2d at 491-92. For example, section 3.1-55-10 of the Illinois Municipal Code makes it a Class 4 felony for municipal officers to have an interest in municipal contracts. 65 ILCS 5/3.1-55-10 (West 2010). Those circumstances, however, are not present here.

¶ 48       Consequently, we agree with other jurisdictions that have held that, under factual circumstances similar to those in the case at bar, Beck's allegation that Coghlan engaged in a classic conflict of interest is nonactionable opinion. See, *e.g.*, *Savage v. Pacific Gas & Electric Co.*, 26 Cal. Rptr. 2d 305, 311 (Cal. Ct. App. 1993) (holding that the defendant cannot be held liable for its executive's "expression of opinion that [the plaintiff] had a conflict of interest" because California's statutory definition of libel and slander "can be meaningfully applied only to statements that are capable of being proved as false or true"); *Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc.*, No. 00-CV-3683, 2001 U.S. Dist. LEXIS 10709, *19 (E.D. Pa. July 26, 2001) (holding that, under Pennsylvania law, defendant's belief that plaintiffs operated under a conflict of interest "cannot be construed to have a defamatory meaning because [it is an] opinion"). Although we disagree with the trial court's finding that the statement at issue was a substantially true statement of fact and hold that the statement is nonactionable opinion, we agree with the trial court's decision to dismiss this claim. As noted above, we review the judgment, not the reasoning, of the trial court and may affirm on any basis in the record. *Leonardi*, 168 Ill. 2d at 97. Plaintiffs' argument is therefore unavailing.

¶ 49       Plaintiffs next contend that the trial court erred in finding Beck's other statements in the written statement to be either opinions or capable of an innocent construction. Plaintiffs' contention centers on Beck's statements that Coghlan: (1) "pocketed the money," (2) was a "corrupt director," (3) "used bully tactics to try to gain yet more money," (4) "failed to give the deliverable that was contracted for," and (5) was operating a "fraud machine."

¶ 50       At the outset, the terms "corrupt director," "bully tactics," and "fraud machine" do not have a "precise and readily understood meaning." See, *e.g.*, *Imperial Apparel, Ltd.*, 227 Ill. 2d at 398. What constitutes corruption or the actions of a bully will vary widely from one

---

[1]Plaintiffs claim that the membership list was not proprietary because it was provided to all attendees at NAWBO Day. Plaintiffs, however, do not support this assertion with a citation to the record, and we do not find any support for this statement in the record. We therefore will not consider it. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008).

person to another. As to the term "fraud machine," and contrary to plaintiffs' assertion, the term does not imply repeated acts of fraud. Moreover, the term "fraud machine" was made in the overall context of Beck's statement seeking the removal of Coghlan as a director of NAWBO-Chicago because, while Coghlan was the moderator of the NAWBO-Chicago listserv, Coghlan intercepted Busch's listserv submission and furthered her personal business prior to making Busch's submission available to all members of NAWBO-Chicago. As noted above, Coghlan admitted in her pleadings that she committed all of those acts. Beck's characterization of Coghlan's actions, while arguably harsh, merely amounts to loose, figurative language that no reasonable person would believe presented facts, and which is therefore nonactionable. *Id.* at 397-98; see also *Greenbelt Cooperative Publishing Ass'n*, 398 U.S. at 13-14 (developer's negotiating position as "blackmail" not defamatory and not suggestive of a crime); *Phantom Touring, Inc.*, 953 F.2d at 728 (calling play " 'a rip-off, a fraud, a scandal, a snake-oil job' " mere hyperbole and constitutionally protected). Finally, Beck's statement that Coghlan failed to provide the contracted-for "deliverable" amounted to a breach of contract allegation. It did not amount to an allegation that Coghlan lacks integrity or is unable to perform her employment or professional duties. We further note that Coghlan never claimed below that she completed the project and delivered it to MBA.

¶ 51    Nonetheless, plaintiffs argue that the trial court committed reversible error because even loose, figurative language can be defamatory when combined with "representations of apparent fact." In support of this argument, plaintiffs cite *Barakat v. Matz*, 271 Ill. App. 3d 662, 671-72 (1995), and *Tunca v. Painter*, 2012 IL App (1st) 093384. *Barakat* and *Tunca*, however, are distinguishable.

¶ 52    In *Barakat*, the defendant was a physician who stated that he had seen some of the plaintiffs' patients before and found nothing wrong with them, that the plaintiff's practice was " 'a joke,' " that the plaintiff was not any good as a doctor, and that the plaintiff's opinion " 'wasn't any good.' " *Barakat*, 271 Ill. App. 3d at 672. The court held that the defendant's comments implied an underlying factual basis that could have been verified, namely, whether the defendant had examined any of the plaintiff's previous patients. *Id.* In *Tunca*, one of the defendants, a surgeon, stated that the plaintiff "negligently and inadvertently cut his patient's artery." *Tunca*, 2012 IL App (1st) 093384, ¶ 47. The court in that case noted that, as in *Barakat*, the defendants' alleged statements with regard to the plaintiff's negligence contained a factual basis–plaintiff's cutting the patient's artery, which the court held to be a readily verifiable fact. *Id.* The court went on to hold that the statement that the plaintiff was professionally negligent in cutting his patient's artery, when considered in context, compelled "a clear interpretation that [the] plaintiff committed professional malpractice." *Id.* By contrast, the statements at issue here do not have any such readily verifiable facts underlying them. Whether Coghlan was corrupt, used bully tactics, or operated a fraud machine cannot be shown to be true or false, whereas the cutting of an artery (as in *Tunca*) or examining another doctor's patients (as in *Barakat*) can be easily verified. *Barakat* and *Tunca* are therefore distinguishable. Therefore, the trial court properly dismissed counts II and III.

¶ 53    Finally, plaintiffs contend that the allegations in count VIII, *i.e.*, that Beck acted "willfully and/or maliciously" in e-mailing the IBM letter to the NAWBO-Chicago board,

were sufficiently specific to withstand a motion to dismiss. The statement in the IBM letter that plaintiffs alleged was defamatory was the statement that IBM and NAWBO were exposed to litigation risk because Coghlan had used both organizations and continued to use IBM to continue her "misrepresentations" and the "pending theft of MBA property." Plaintiffs allege that Beck knew that the statements in the IBM letter were false but published them regardless in order to harm Coghlan's and Catwalk's professional reputations.

¶ 54    Plaintiffs' allegations in count VIII, however, do not provide any factual context of the e-mail containing the IBM letter, such as, whether (1) Beck sent the message with the IBM letter from her personal, business, or (if she had one) a NAWBO-Chicago e-mail account or (2) Beck's e-mail message indicated her agreement or disagreement with the content of Busch's IBM letter, which would either enhance or weaken a claim that NAWBO-Chicago was liable as principal. We further note that plaintiffs merely alleged that the republication was to "several" members of the NAWBO-Chicago board, but they do not specify which of the board members received the e-mail. The amended complaint's failure to specify to whom the allegedly defamatory matter was communicated rendered it insufficient to survive a motion to dismiss. See, *e.g.*, *Edelman, Combs & Latturner*, 338 Ill. App. 3d at 168 (memorandum published to "John Doe" insufficient because "it cannot be determined from the complaint to whom or under what circumstances the allegedly libelous statements were communicated"); *Lykowski v. Bergman*, 299 Ill. App. 3d 157, 164 (1998) (holding that a complaint was factually deficient because it cannot be determined from the complaint to whom the allegedly libelous statements were communicated; "allegations that the libelous statements were transmitted 'to the newspapers' and to 'plaintiff's employer' is not particularly helpful in this regard"). As noted above, conclusory factual assertions are insufficient to state a cause of action, even if they generally inform a defendant of the nature of the claim being alleged. *Adkins*, 129 Ill. 2d at 519-20. Rather, "a defamation *per se* claim must be pled with a heightened level of precision and particularity." *Green*, 234 Ill. 2d at 495. Therefore, on that basis alone, the trial court properly granted Beck's and MBA's section 2-619.1 motion to dismiss.

¶ 55    Moreover, plaintiffs failed to overcome Beck's qualified privilege to republish Busch's IBM letter to the NAWBO-Chicago board. Beck, in her capacity as president, was investigating the conduct of Coghlan, a fellow board member and the previous president of NAWBO-Chicago, and therefore she unquestionably had an interest in republishing the IBM letter to the board. *Popko*, 355 Ill. App. 3d at 264. Thus, Beck had a qualified privilege, which could only be overcome with a showing that Beck republished the letter with actual malice.

¶ 56    Plaintiffs claim, however, that they have sufficiently pled malice. We disagree. Plaintiffs' complaint made the bare conclusory allegation that Beck republished the letter "maliciously" and "knowing that the statements [in the IBM letter] were false." Plaintiffs have alleged no facts from which actual malice may be inferred, *i.e.*, that Beck republished the IBM letter with a high degree of awareness of its probable falsity or that she had serious doubts as to its truth. *Kuwik*, 156 Ill. 2d at 24-25. Plaintiffs' bare allegations are insufficient to show actual malice. *Davis*, 261 Ill. App. 3d at 431. Accordingly, the trial court's dismissal of count VIII must be affirmed.

-14-

¶ 57    The Claim for Conspiracy to Commit Libel *Per Se* (Count V)

¶ 58    In count V, plaintiffs alleged that Beck and Busch conspired to commit libel *per se*. Before this court, plaintiffs contend that the trial court erred in dismissing this claim because it failed to construe the pleadings in the light most favorable to plaintiffs.

¶ 59    "In order to state a claim for civil conspiracy, a plaintiff must plead a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 23-24 (1998) (citing *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994)). It should be noted, however, that "[t]he mere characterization of a combination of acts as a conspiracy is insufficient to withstand a motion to dismiss." *Id.* at 23. Instead, it is well established that, to allege a conspiracy, "the complaint must set forth with particularity the facts and circumstances constituting the alleged conspiracy." *Heying v. Simonaitis*, 126 Ill. App. 3d 157, 163 (1984) (citing *Owens v. Green*, 400 Ill. 380, 393 (1948)). In addition, conspiracy is not an independent tort: the conspiracy claim fails if the independent cause of action underlying the conspiracy allegation fails. *Indeck North American Power Fund, L.P. v. Norweb PLC*, 316 Ill. App. 3d 416, 432 (2000) (citing *Adcock*, 164 Ill. 2d 54, and *Davis v. Times Mirror Magazines, Inc.*, 297 Ill. App. 3d 488, 499 (1998)).

¶ 60    The trial court below properly dismissed plaintiffs' allegation of a conspiracy on two bases. First, as noted above, plaintiffs' claim for libel *per se* against Beck based upon the written statement (count II) was properly dismissed. Therefore, plaintiffs' claim of a conspiracy predicated on count II also fails. See *Indeck*, 316 Ill. App. 3d at 432. Second, plaintiffs' factual allegations vaguely referred to Beck and Busch "sharing information" and "working together" on the written statement. Plaintiffs then asserted that Beck and Busch acted maliciously and knew the content of the written statement was false but published it regardless in order to impugn plaintiffs' professional reputation. In essence, plaintiffs have merely characterized the actions of Beck and Busch as a conspiracy and have not set forth with particularity the facts and circumstances constituting the alleged conspiracy. This, too, is insufficient to survive a motion to dismiss. See *Buckner*, 182 Ill. 2d at 23. The trial court thus properly dismissed count V of plaintiffs' verified first amended complaint.


¶ 61    Busch's Statements in the IBM Letter (Count IV)

¶ 62    Count IV alleged libel *per se* against Busch based upon her statement in the IBM letter that IBM and NAWBO were exposed to legal risk due to Coghlan's misrepresentations and "pending" theft of MBA's property. Plaintiffs contend that the trial court erred in finding that the IBM letter was subject to a qualified privilege, that plaintiffs failed to sufficiently plead Busch's abuse of that privilege, and that the IBM letter could be innocently construed.

¶ 63    However, plaintiffs never raised this issue before the trial court below. In their response to defendants' motions to dismiss, plaintiffs only stated that they did not dispute that Busch "may have had" a qualified privilege prior to their more robust argument that Busch abused that privilege "if it existed." This argument was insufficiently presented to the trial court and is thus forfeited. *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996) ("It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first

time on appeal."); *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 36.

¶ 64    Moreover, Busch had a qualified privilege to make the statement at issue. Busch, the chief executive officer of MBA, had an interest in protecting MBA's rights under the contract with plaintiffs. See *Kuwik*, 156 Ill. 2d at 27. The IBM letter explains the various problems Busch experienced with Catwalk and Coghlan during the project. Busch expressed her belief that Coghlan misrepresented Coghlan's abilities to successfully complete the project, and Busch stated that Coghlan refused to return MBA's property, which may have included HIPAA-protected health information as well as other intellectual property belonging to MBA. Further, Busch complained that IBM's Advanced Business Partner division did not conduct a thorough background check of plaintiffs. Busch's statement thus was protecting the interests of MBA, as well as IBM (her lender) and NAWBO (of which Busch was a member). Busch therefore had a qualified privilege to make the statement at issue, and plaintiffs consequently had to show that Busch abused that privilege.

¶ 65    Plaintiffs, however, failed to make any showing that Busch abused her privilege. As noted above, plaintiffs had to establish that Busch either intentionally published the statement knowing it to be false or displayed a reckless disregard as to its falsity (*i.e.*, having either a high degree of awareness of its probable falsity or having serious doubts as to its truth). *Kuwik*, 156 Ill. 2d at 24-25. Plaintiffs, however, make the conclusory assertion that Busch acted willfully and/or maliciously and knew that the statement was false but published it nonetheless to harm plaintiffs' professional reputation. This bare allegation that Busch acted maliciously and with knowledge that the statement was false is insufficient. *Davis*, 261 Ill. App. 3d at 431. Dismissal was therefore warranted on this basis, as well.

¶ 66    Finally, we disagree with plaintiffs' contention that the statement was not subject to an innocent construction. As discussed above, we must consider the statement in context and give its words and their implications a natural and obvious meaning. *Green*, 234 Ill. 2d at 499. We must also interpret the statement as nondefamatory if it is reasonable to so, unless Busch "clearly intended and unmistakably conveyed a defamatory meaning." *Id.* at 500.

¶ 67    Here, the context of the letter reveals that the statement can be reasonably interpreted as nondefamatory. The context of the statement at issue is that, following an unsatisfying experience with plaintiffs, Busch criticized IBM's alleged lack of due diligence in conducting a background check of plaintiffs, and warned IBM that it and NAWBO could potentially be held liable based upon what Busch believed was Coghlan's refusal to return its intellectual property (possibly including HIPAA-protected health information). We cannot find that Busch clearly intended and unmistakably conveyed a defamatory meaning. Although plaintiffs note that Busch used the term "theft" in the statement, that term does not necessarily imply the commission of a criminal act. See, *e.g.*, *Harrison*, 341 Ill. App. 3d at 569-71 (mother's alleged "kidnapping" of her child may be reasonably capable of an innocent construction and not the commission of a criminal act); *Owen v. Carr*, 134 Ill. App. 3d 855, 859-61 (1985) ("intimidate" reasonably interpreted as conduct other than commission of crime of intimidation), *aff'd*, 113 Ill. 2d 273 (1986). The term "theft" appears in a letter that complains of Coghlan's failure to provide the "deliverable" despite being fully paid, her alleged misrepresentations as to her background and qualifications, and Catwalk's alleged refusal to return MBA's intellectual property. We therefore agree with the trial court

-16-

that the letter's overall context merely reflects Busch's dissatisfaction with the result of its transaction with plaintiffs. Accordingly, the trial court properly dismissed count IV.

¶ 68                    The Claims Against NAWBO and NAWBO-Chicago
                                (Counts VI, VII, and IX)

¶ 69    Plaintiffs' final contentions on appeal concern their allegations against NAWBO-Chicago and NAWBO. Plaintiffs fault the trial court for finding that Beck's actions in both publishing her written statement and republishing Busch's IBM letter to the NAWBO-Chicago board were subject to a qualified privilege, arguing that they sufficiently pled Beck's abuse of that privilege. Plaintiffs also contend that count IX sufficiently pled NAWBO's and NAWBO-Chicago's vicarious liability.

¶ 70    As noted above, Beck, the president NAWBO-Chicago, was investigating the conduct of Coghlan, a fellow board member and the previous president, and thus had an interest in republishing the IBM letter to the board. *Popko*, 355 Ill. App. 3d at 264. Thus, Beck had a qualified privilege, which could only be overcome with a showing that Beck republished the letter with actual malice. Again, however, plaintiffs' complaint merely alleged in conclusory fashion that Beck's actions were done "maliciously" and with knowledge the statement in the IBM letter was false. In the absence of any facts that Beck had a high degree of awareness of the statement's probable falsity or that she had serious doubts as to its truth (*Kuwik*, 156 Ill. 2d at 24-25), the trial court properly found that plaintiffs' failed to show actual malice. Therefore, counts VI and VII warranted dismissal.

¶ 71    Finally, count IX, alleging vicarious liability on the part of NAWBO-Chicago and NAWBO based upon Beck's e-mailing of the IBM letter (written by Busch) to several members of the NAWBO-Chicago board (*i.e.*, count VIII), was properly dismissed as well.

¶ 72    Under the theory of *respondeat superior*, an employer can be liable for the torts of an employee, but only for those torts that are committed within the scope of the employment, including negligent, willful, malicious, or even criminal acts. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163-64 (2007). Plaintiff has the burden of showing the contemporaneous relationship between the tortious act and the scope of employment. *Id.* at 165. While the existence of an agency relationship is generally a question reserved to the trier of fact, "a plaintiff must still plead facts, which, if proved, could establish the existence of an agency relationship." *Knapp v. Hill*, 276 Ill. App. 3d 376, 382 (1995) (rejecting as insufficient to establish a principal-agency relationship a factual allegation that a school district, through its shop teacher, was responsible for directing the method and manner of removing automobiles from the shop area, and thus exercised the requisite control over a defendant student), *appeal denied*, 165 Ill. 2d 552 (1996) (table).

¶ 73    In this case, plaintiffs did not meet their burden in showing the relationship between Beck's allegedly tortious act (e-mailing Busch's IBM letter to certain unnamed NAWBO-Chicago board members) and the scope of her employment with NAWBO-Chicago. Plaintiffs' complaint alleged that Beck, as NAWBO-Chicago's president, was "at all times" acting as its agent and as NAWBO's agent. Plaintiffs, however, make no allegation that Beck's actions were within the scope of her employment of NAWBO-Chicago or NAWBO.

In other words, plaintiffs did not plead sufficient facts to show that Beck's actions were somehow required by NAWBO-Chicago or NAWBO. Rather, plaintiffs' allegation (that Beck republished the IBM letter despite knowing it to be false) merely pleads the conclusion that Beck was acting at the behest of NAWBO-Chicago and NAWBO. Similarly, plaintiffs' bald assertion that Beck was also an agent of NAWBO because she was the president of NAWBO-Chicago is a conclusion that is completely unsupported by any factual allegation. Because plaintiffs did not plead facts that, if proved, could establish the existence of an agency relationship, dismissal was appropriate. *Knapp*, 276 Ill. App. 3d at 382. Accordingly, count IX of the verified first amended complaint was properly dismissed, as well.

¶ 74                                      CONCLUSION

¶ 75      The trial court did not err in granting defendants' motions to dismiss. The breach of contract claim was negated by plaintiffs' verified allegations in the complaint and the exhibits attached thereto. Plaintiffs' claim of libel *per se* and slander *per se* were properly dismissed because plaintiffs' factual allegations were conclusory and the statements at issue (i) were not defamatory *per se*, (ii) they were subject to a qualified privilege that plaintiffs failed to overcome, or (iii) they were subject to an innocent construction. Finally, plaintiffs' claim of civil conspiracy was properly dismissed because plaintiffs failed to properly allege an underlying tort and because plaintiffs' factual allegations were conclusory. Accordingly, we affirm the judgment of the trial court.

¶ 76      Affirmed.