2018 IL App (1st) 171850
Opinion filed: September 14, 2018

FIRST DISTRICT
Fifth Division

No. 1-17-1850

| | | |
|---|---|---|
| PLAY BEVERAGES, LLC, and CIRTRAN BEVERAGE CORPORATION, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs and Counterdefendants-Appellants, | ) ) | |
| v. | ) ) | No. 12 L 12181 |
| PLAYBOY ENTERPRISES INTERNATIONAL, INC., | ) ) ) | Honorable Raymond W. Mitchell, |
| Defendant and Counterplaintiff-Appellee. | ) | Judge Presiding. |

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Hall concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs, Play Beverages, LLC (PlayBev) and CirTran Beverage Corporation (CTB)

brought a second-amended complaint against defendant, Playboy Enterprises International, Inc.

(Playboy) to recover damages relating to Playboy's alleged breach of a license agreement

pursuant to which PlayBev was granted the exclusive right to distribute the Playboy Energy

Drink. Plaintiffs' causes of action included breach of contract, breach of the implied covenant of

good faith and fair dealing, tortious interference with contract, promissory estoppel, injunctive

relief, and civil conspiracy. Playboy brought several counterclaims against plaintiffs, including

breach of contract, trademark infringement, trademark dilution, false advertising, violation of the

Uniform Deceptive Trade Practices Act (815 ILCS 510/1 (West 2012)), and violation of the

Anti-Cybersquatting Consumer Protection Act (15 U.S.C. § 1125(d) (2012)). The jury found in

favor of Playboy on each of plaintiffs' claims, and also returned a verdict in favor of Playboy on

its counterclaims and awarded it $6.6 million in damages for trademark infringement and breach

of contract. The trial court subsequently denied plaintiffs' posttrial motions and granted

Playboy's motion for attorney fees and for treble damages under 15 U.S.C. § 1117(b) (2012). On appeal, plaintiffs argue that the trial court erred by (1) denying their request to interrupt the second day of jury deliberations and question three jurors regarding their statement to the court clerk the day before that they were "scared" of "the men in the gallery;" and (2) admitting the video testimony of witness, Lori Bodily, regarding threatening comments made to her by Fadi Nora, a manager of PlayBev. We affirm.[1]

¶ 2                                BACKGROUND

¶ 3                         I. Pretrial Proceedings

¶ 4     Prior to trial, the trial court entered an *in limine* order excluding any reference at trial to the ethnicity and national origin of Mr. Nora, or Iehab Hawatmeh, the chief executive officer of CTB. Playboy honored the *in limine* order.

¶ 5     During *voir dire*, plaintiffs (not Playboy) twice told prospective jurors that certain witnesses speak with an accent because they are from outside of the United States, and they asked the panelists whether that would cause them to not believe such witnesses. No prospective juror responded in the affirmative.

¶ 6                             II. Trial Testimony

¶ 7                                A. The Parties

¶ 8     Playboy is a corporation with its principal place of business in California. Playboy derives substantial revenue from licensing its trademarked name and bunny-head logo (the Playboy Marks) to entities who sell many types of consumer products, such as apparel, handbags, luggage, and fragrances.

---

[1]     Justice Hall has listened to a recording of oral arguments.

¶ 9    PlayBev is a limited liability company based in Utah, which was formed in 2006 for the purpose of creating and selling a nonalcoholic energy drink.

¶ 10    CTB is a wholly-owned subsidiary of CirTran Corporation, a publicly-traded company with 2000 shareholders. During the relevant time period, CTB was engaged in the marketing and designing of a wide variety of consumer products.

¶ 11                         B. The 2006 Exclusive License Agreement

¶ 12    PlayBev and Playboy entered into an exclusive license agreement in December 2006, pursuant to which Playboy agreed to license the Playboy Marks to PlayBev for use on the Playboy Energy Drink, meaning that PlayBev would be the only company that would have an energy drink with the Playboy name and bunny-head logo.

¶ 13    The license agreement provided that PlayBev would pay Playboy minimum annual royalties (beginning at $1 million and later increased to $2 million) for use of the Playboy Marks, and it required that PlayBev achieve certain minimum sales. The parties agreed that PlayBev "shall be responsible for and shall assume and pay for all costs and expenses related to [PlayBev's] design, manufacture, advertising, promotion, sale and distribution" of the energy drinks. The license agreement imposed no requirements on Playboy to support PlayBev's sales or to refrain from advertising or buying competing brands.

¶ 14    The parties agreed that the license agreement would expire on March 31, 2012, unless three renewal conditions precedent were met: (1) Playboy "provided, not later than February 1, 2012, its written approval for the Agreement to renew;" (2) PlayBev achieved certain minimum net sales for each license year; and (3) PlayBev was "in full compliance with all of the terms and conditions of this Agreement, including the timely payment of all amounts required under this Agreement."

¶ 15                    C. PlayBev's Relationship With CTB

¶ 16    The original principals of PlayBev did not have experience with beverage marketing or distribution. In 2007, the PlayBev principals sold their interest in PlayBev to Mr. Hawatmeh, the chief executive officer of CTB, which had experience marketing consumer products. PlayBev subsequently contracted with CTB to manufacture and distribute the Playboy Energy Drink.

¶ 17                    D. Initial Product Development and Marketing

¶ 18    After the formula for the Playboy Energy Drink was developed, plaintiffs conducted focus groups and developed a marketing plan that centered on a promotional bus tour in the southeastern region of the United States. They hired Andrei McQuillan to manage marketing. Mr. McQuillan had previous experience marketing certain celebrities but not beverages.

¶ 19    In the energy drink market, there are two avenues for distribution: on-premises (sold at a restaurant, bar or nightclub) and off-premises (sold at a grocery store or convenience store). Plaintiffs' branding and marketing focus was on the on-premises sales. The primary distribution strategy was to get the Playboy Energy Drink into high-visibility, on-premises locations to create branding cachet. Plaintiffs also pursued an international strategy, enlisting distributors for the Playboy Energy Drink in 65 countries.

¶ 20                    E. Product Failure

¶ 21    Plaintiffs suffered severe operating losses for calendar years 2007 to 2012, resulting in the failure of the Playboy Energy Drink.

¶ 22    Plaintiffs argued at trial that sales of the Playboy Energy Drink were poised to increase in 2011, until Playboy sent them default and termination notices in May and June 2011 and allegedly interfered with a contract with one of plaintiffs' distributors and tried to take over the international distribution network. Plaintiffs also argued that Playboy breached the terms of the

license agreement by contracting with other energy drink companies to serve their energy drinks at Playboy-owned properties, thereby hurting sales of the Playboy Energy Drink and contributing to its failure.

¶ 23　Playboy denied these allegations, arguing that the sales for the Playboy Energy Drink had been falling for four years for a variety of reasons, none of which had anything to do with any alleged conduct by Playboy; that PlayBev fell behind in paying royalties and had never met the minimum sales requirements; and that, after PlayBev was placed into bankruptcy, it stopped paying any royalties while continuing to sell the product.

¶ 24　　　　　F. Testimony Regarding the Reasons for the Product Failure

¶ 25　　　　　　　　1. Robert Nistico

¶ 26　Robert Nistico testified that he served as president of PlayBev and executive vice president of CTB from 2007 to 2009, after having previously worked at several beverage firms, including 10 years at Red Bull. Mr. Nistico explained that the Playboy Energy Drink failed because "[w]e didn't receive enough repeat orders. *** In the markets where we supported the brand it was difficult to gain distribution, and when we did, the consumer for some reason wasn't picking the brand up for a second time."

¶ 27　　　　　　　　2. Ralph Kytan

¶ 28　Ralph Kytan worked for 34 years as a beverage marketing executive, until his retirement in 2013. Mr. Kytan opined that plaintiffs failed to develop, fund, and implement a professional marketing plan, which impeded their ability to successfully penetrate the competitive energy drink market. Plaintiffs also failed to spend the money necessary to advertise the product and erred in attempting to introduce the product to 65 international markets within a short time

period. Plaintiffs also experienced problems with leaking cans, which adversely affected their sales.

¶ 29                                    3. Christina Eden

¶ 30    Christina Eden was hired in 2009 as PlayBev's Mid-Atlantic and New York region sales director after having previously worked for Red Bull for 10 years. Ms. Eden testified that unlike Red Bull, plaintiffs had "no real short or long-term plan" or strategy for selling the Playboy Energy Drink. Ms. Eden also noted plaintiffs failed to consistently pay their vendors on time, which damaged the credibility of the brand, and that plaintiffs failed to provide enough "point-of sale" materials, *i.e.*, displays, signage and other items that give the product visibility in the store or bar where it is sold.

¶ 31                                    4. Kathryn Chalmers

¶ 32    Kathryn Chalmers, PlayBev's Southern California sales manager from 2008 through 2009, testified similarly to Ms. Eden that plaintiffs' marketing strategy was "helter-skelter" and that the nonpayment of vendors and the lack of point-of-sale materials hurt sales.

¶ 33                                    5. Andrei McQuillan

¶ 34    Mr. McQuillan testified to plaintiffs' failure to pay the bus tour company as well as other vendors.

¶ 35                                    6. Lori Bodily

¶ 36    Lori Bodily worked for CirTran Corporation for about three years, beginning in 2008, and testified via video evidence deposition. Ms. Bodily testified that she handled accounts payable and payroll matters, including those for CTB, and that, in her over 26 years of accounting experience, CirTran Corporation was the first company she had worked for that had accounts payable of over 190 days. She regularly fielded calls from bill collectors, including, for

example, from a company that produced point-of-sale marketing materials that refused to extend further credit to CTB.

¶ 37    Ms. Bodily testified that, after being subpoenaed for her evidence deposition in this case, Mr. Nora called her and told her "not to come to this, told me not to get involved. Told me—I don't know if he was being threatening, or—he offered to get an attorney to get me out of the deposition. He also said, and this is why I'm nervous about Iehab [Hawatmeh] being in here, his exact words were, 'Do you know who Iehab knows? Do you know how well connected he is? Do you know what he is capable of?' " Ms. Bodily further testified that Mr. Nora's phone call "felt like a threat" and made her afraid to testify.

¶ 38                    G. Termination of the License Agreement

¶ 39    PlayBev fell behind in its payment of the royalty payments beginning April 1, 2010. Playboy allowed PlayBev to pay installments rather than the lump sum of $2 million that was owed. PlayBev stopped making any royalty payments in May 2011. With $1.6 million still owed Playboy in unpaid royalties, it sent PlayBev a notice of default on May 27, 2011, and a notice of termination on June 7, 2011.

¶ 40                    H. PlayBev's Bankruptcy

¶ 41    On June 7, 2011, PlayBev notified Playboy that it was in involuntary bankruptcy and, as a result of the automatic stay, its license agreement could not be terminated. PlayBev subsequently converted the bankruptcy to a voluntary Chapter 11 proceeding.

¶ 42    Playboy moved in the bankruptcy court to lift the stay to proceed with the termination of the license agreement, but ultimately withdrew the motion and negotiated a new five-year license agreement with PlayBev, pursuant to which the $1.6 million in unpaid royalties would be forgiven as long as Playboy was paid an initial $2 million in royalties for the first year of the new

agreement. However, PlayBev failed to make the initial $2 million deposit, which prevented the agreement from going into effect.

¶ 43    Despite the fact that PlayBev's license agreement had been terminated for failure to pay royalties, plaintiffs continued to sell the Playboy Energy Drink (*i.e.*, continued to use the Playboy Marks even though they were no longer licensed to do so).

¶ 44    After the dismissal of the bankruptcy, Playboy sued plaintiffs in federal court in California, alleging that the license agreement had expired, and seeking, among other things, an injunction to bar the continued sale of the Playboy Energy Drink. The suit was transferred to the Northern District of Illinois, which dismissed the case without prejudice due to the pendency in the circuit court of this lawsuit, which plaintiffs had filed in 2012. Playboy refiled its claims as counterclaims in this action.

¶ 45                              II. Playboy's Closing Argument

¶ 46    In pertinent part, Playboy argued during closing that Mr. Hawatmeh was a "scoundrel" because he had directed plaintiffs to continue using the Playboy Marks on their energy drink even after the license was terminated and because plaintiffs had not made royalty payments for their use of the trademarks since mid-2011.

¶ 47                              III. Plaintiffs' Motion for a Mistrial

¶ 48    The jury was instructed and then began deliberations at 3:45 p.m. on October 20, 2016. The next morning, the trial court summoned the parties to chambers and stated:

> "Last night when I was leaving, the court clerk told me that three jurors, as they were leaving, asked her if there was a secret way out. And she didn't understand what they were asking. And then they indicated that they were scared of the men in the gallery. The clerk said, everybody has left. And that she would let me know."

¶ 49    Plaintiffs argue that the "men in the gallery" was a reference to Shaher Hawatmeh, Pakrad Markarian, Vatche Elmedjian, and Rajayee Sayegh, who were PlayBev's investors and men of Middle Eastern descent. They had sat in the gallery at times during the trial. Playboy contends that it is unclear who the jurors were referring to when they stated that they were fearful of the men in the gallery.

¶ 50    The trial court stated that, in response to the jurors' concerns, it was considering giving the jury the following instruction:

"You probably noticed that some things have changed since you have started your deliberations. These are things that we do in every trial once deliberations are underway. At my request, our deputy sheriff has collected your cell phones while you are here today. The courtroom has been cleared and is locked to ensure privacy. To the extent there is anyone here, they are lawyers on unrelated cases.

During the trial on breaks and at lunch you were free to go out on your own, but now that deliberations have begun, I ask that you stay in and have lunch here together. To the extent that you want to take a break and get fresh air, you will go as a group accompanied by our deputy.

On breaks and at the end of the day, I ask that you stay together with our deputy who will bring you out in our private elevator.

I want to remind you again that during your deliberations, you're to have no conversations with anyone about the case other than your fellow jurors, not your family or friends, not the courtroom staff, not even me. There is only one exception: you have a request or question, please write it in a note and give it to our deputy who will bring it to me.

All of this is designed to ensure that your verdict is based on the law introduced at trial, my instructions on the law. Your oath as jurors requires that you follow all the instructions."

¶ 51    All the parties initially indicated their agreement with the giving of this instruction; plaintiffs stated: "It sounds like it will alleviate the concern over stray individuals in the hallway, things like that."

¶ 52    Plaintiffs subsequently asked that the court strike the portion of the instruction stating that the deputy would bring the jurors out in a "private elevator." The trial court responded: "the reason why I put it in is they specifically asked to leave through a secret way. They are asking to leave through the back." The court gave the jury the full instruction, including the clause regarding the use of the private elevator. The jury continued to deliberate.

¶ 53    Later that same day, plaintiffs filed a motion for a mistrial. In the motion, plaintiffs argued that the testimony of Ms. Bodily regarding Mr. Nora's threats to her from Mr. Hawatmeh should have been excluded as it was irrelevant and its probative value was substantially outweighed by the danger of unfair prejudice under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011). Plaintiffs further argued that the testimony of Ms. Bodily, coupled with Playboy's closing argument when it referred to Mr. Hawatmeh as a scoundrel, as well as the jurors' stated concern about the men in the gallery, "suggests the jury process has been tainted and that a fair verdict based on the evidence may not be rendered."

¶ 54    The parties reconvened in chambers. Plaintiffs presented their mistrial motion and stated:

"We have a follow-on motion to that, and that is that we think it would be appropriate for the court to exercise its discretion and inquire of these three jurors the reasons for their concern, to determine if they have become either biased or no longer

capable of rendering a fair verdict. So I guess I formally will make a motion for us to question these three jurors about the reasons for their concern."

¶ 55    An extensive colloquy ensued, during which the trial court quoted Rule 606(b) of the Illinois Rules of Evidence (Ill. R. Evid. 606(b) (eff. Jan. 1, 2011)), which states:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify (1) whether any extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form."

¶ 56    The court then explained its general understanding of Rule 606(b), that any inquiry into the jurors' subjective beliefs or thought processes was "strictly off limits," and that the jurors could only be questioned about an "external" influence, such as if one of the jurors had improperly brought into the jury room a newspaper that discussed the case.

¶ 57    Plaintiffs pointed out that Rule 606(b) only addressed the propriety of an inquiry *after* a verdict had been rendered and was inapplicable, as the jurors were still then in the middle of deliberations and had not yet rendered a verdict. Plaintiffs argued that, instead of looking to Rule 606(b) for guidance as to whether and how the jurors should be questioned, the court should, instead, consider whether the deliberations of the jurors were being influenced by their fear of the men in the gallery. Plaintiffs contended that, in order to determine whether the deliberations

were being so influenced, the court should interrupt the deliberations and ask the jurors: "What is the basis for your fear of the men in the gallery?"

¶ 58    The trial court noted that the only evidence before it was that the jurors had told the court clerk that they were afraid of the men in the gallery and that the jurors wanted a secure entrance and exit to the courtroom. There was no evidence that the men ever looked askance at the jurors, spoke, or attempted to speak to them, or in any other way conveyed any type of threat to them. There was no evidence that the men had attempted to, in any way, influence the jury deliberations or that they had been successful in doing so. On this record, the court determined that the instruction it had given the jury had satisfied the concern of the three jurors about a secure entrance and exit into and out of the courtroom, and it declined to otherwise interrupt the jury deliberations to question the jurors about their statement to the court clerk.

¶ 59                                IV. The Verdict

¶ 60    Later that same day, on October 21, 2016, the jury found in favor of Playboy on each of plaintiffs' claims, and also returned a verdict in favor of Playboy on its counterclaims and awarded it $6.6 million in damages for trademark infringement and breach of contract.

¶ 61                        V. Plaintiffs' Posttrial Motion

¶ 62    Plaintiffs filed a posttrial motion, alleging that the motion for a mistrial should have been granted because the three jurors' stated fear of the "men in the gallery" suggested that they were biased toward persons from the Middle East because certain investors of PlayBev who sat in the gallery during the trial are of Middle Eastern descent. Plaintiffs attached no affidavits from any juror substantiating the claim of bias.

¶ 63    Plaintiffs also argued that the court erred in admitting the testimony of Ms. Bodily about Mr. Nora's threatening statements regarding Mr. Hawatmeh.

¶ 64    In its written order denying plaintiffs' posttrial motion, the trial court stated that plaintiffs' claim of the jurors' anti-Middle Eastern bias was being raised "for the first time" and was "without merit." The court noted:

"Nothing the three jurors said implicated ethnicity. Plaintiffs' complaints about ethnic bias and a 'nativist' case are invented. During the trial and the jury's deliberations, Plaintiffs never once raised this concern. Despite being afforded the opportunity to conduct posttrial interviews with jurors, Plaintiffs have failed to offer any affidavits or any other evidence that supports the suggestion that the jury's deliberations in any way touched on ethnic bias. There was no testimony at trial concerning the ethnicity of any witnesses. The only reference to ethnicity occurred outside the presence of the jury when the parties agreed to a motion *in limine* to exclude any reference to the ethnicity of Iehab Hawatmeh or Fadi Nora. Plaintiffs' arguments now are based solely on conjecture and speculation."

¶ 65    With respect to plaintiffs' argument regarding the admissibility of the testimony of Ms. Bodily, the trial court stated:

"Plaintiffs object to testimony from Lori Bodily that she felt threatened after speaking with Fadi Nora, who told her not to appear for her deposition and asked her if she knew what Iehab Hawatmeh was capable of doing. Testimony regarding efforts to intimidate witnesses is admissible for certain purposes, including to show consciousness of guilt. See *People v. Baptist*, 76 Ill. 2d 19, 28 (1979); *People v. Gambony*, 402 Ill. 74, 80 (1948) ('Any attempt by a party to a suit, either civil or criminal, to conceal or, by threats or otherwise, to suppress evidence or obstruct an investigation of an issue, is

relevant upon the trial of such issue.'). Plaintiffs never presented testimony rebutting Bodily's contentions or suggesting in any way that her testimony was untrue."

¶ 66    The trial court concluded that plaintiffs "were not deprived of a fair trial for any of the reasons asserted, or based on a totality of all the issues raised. The jury's verdict was not against the manifest weight of the evidence."

¶ 67                          VI. Playboy's Posttrial Motion

¶ 68    Playboy filed a motion for a permanent injunction barring plaintiffs from continuing to use the Playboy Marks. The trial court granted the motion and entered a permanent injunction.

¶ 69    Playboy also filed a motion for attorney fees and for trebling of the verdict, both of which the trial court granted.

¶ 70                                    ANALYSIS

¶ 71          I. Refusal to Question Jurors Regarding the Statement that They Were
                          Scared of the Men in the Gallery

¶ 72    First, we address whether the trial court erred by denying plaintiffs' oral motion to interrupt the second day of jury deliberations and question three jurors about their statement the day before that they were scared of the "men in the gallery." The purpose of the proposed inquiry was to determine if the jurors had become biased or incapable of rendering a fair verdict.

¶ 73    "[T]he question of whether jurors have been influenced and prejudiced to such an extent that they would not, or could not, be fair and impartial involves a determination that must rest in sound judicial discretion" (*People v. Runge*, 234 Ill. 2d 68, 104 (2009)), and will not be overturned absent an abuse thereof. *Id.* at 105. "The trial judge's discretion clearly extends to the initial decision of whether to interrogate jurors." *Id.*

¶ 74    Plaintiffs contend that the abuse of discretion standard does not apply here, though, because the trial court committed an error of law by considering Rule 606(b) when denying their

motion to interrupt the deliberations and question the three jurors. A question of law is reviewed *de novo*. *In re Jawan S.*, 2018 IL App (1st) 172955, ¶ 26.

¶ 75    Plaintiffs argue that Rule 606(b), which prevents inquiry into the jurors' subjective mental processes that occurred during deliberations but allows for inquiry into any "extraneous prejudicial information" or any "outside influence" that was improperly brought to bear on any juror, expressly applies only to *postverdict* inquiries, not, as here, to inquiries made of the jurors prior to the rendering of a verdict. See Ill. R. Evid. 606(b) (eff. Jan. 1, 2011). Plaintiffs contend that the court improperly looked to Rule 606(b) for guidance in determining whether and how to question the jurors during their deliberations, and that in doing so, the court did not adequately analyze and consider their motion.

¶ 76    We find that the trial court's single recitation of Rule 606(b) did not interfere with or hamper its analysis of plaintiffs' motion and did not constitute a reversible error of law. Specifically, our review of the record shows that, during the discussion of plaintiffs' motion to interrupt the second day of jury deliberations to question the three jurors, the trial court quoted Rule 606(b), after which plaintiffs immediately informed the court that Rule 606(b) only applied to postverdict inquiries. The trial court responded: "Right." Plaintiffs then argued that the court's analysis should center on whether there was evidence that the deliberations of the three jurors had been influenced by their fear of the men in the gallery and that the court should question the jurors as to the basis for their fear so as to determine whether their deliberations had been so influenced. In responding to plaintiffs' argument, the trial court considered the absence of any allegation or evidence that any of the men in the gallery had contacted, spoken with, threatened, or even looked at the jurors, and thus, the court determined that on this record, plaintiffs had

failed to make any showing that the deliberations of the jurors were, in any way, affected or influenced by them.

¶ 77    The court further noted that, if the three jurors had expressed their fear of the men in the gallery prior to deliberations, their concerns could have been addressed with minimal disruption of the trial, but that since the jurors had waited to voice them until after deliberations had begun, the court needed to consider how best to address the jurors' concerns without unduly disrupting the deliberative process. The court determined that the instruction it had earlier given achieved the appropriate balance by informing the jury about the closing of the courtroom and the escorted passage to the private elevator, thereby addressing the three jurors' specific request for a secure entrance and exit to the courtroom, while at the same time allowing the deliberations to continue. Accordingly, having given this instruction, the court exercised its discretion and denied plaintiffs' motion to interrupt the second day of jury deliberations and question the three jurors as to the basis of their fears of the men in the gallery.

¶ 78    Plaintiffs next argue that, even if the trial court made no reversible error of law by citing Rule 606(b) during its analysis here, we should still find that the court abused its discretion by denying their motion to make an inquiry of the three jurors to determine if they had become biased or incapable of rendering a fair verdict.

¶ 79    We disagree. Our supreme court has held that not every allegation of juror bias is sufficiently substantial or sufficiently well substantiated to warrant inquiry, and that sometimes "less is more" when it comes to judicial investigation thereof. *Runge*, 234 Ill. 2d at 104. A trial court, in exercising its investigatory discretion, must assess the particular circumstances before it to ascertain whether questioning individual jurors might compound the problem by drawing

attention to it. *Id.* The trial court may consider its own observation of the jurors when determining whether to conduct an inquiry. *Id.*

¶ 80     The trial court here had seen the jurors, assessed the particular circumstances surrounding the allegation of potential bias, and determined that an interruption of their second day of deliberations for individual questioning was not warranted under the facts presented. We find no abuse of discretion.

¶ 81     Plaintiffs argue that *People v. Mitchell*, 121 Ill. App. 3d 193 (1984), and *People v. Green*, 282 Ill. App. 3d 510 (1996), compel a different result, but both cases are factually inapposite.

¶ 82     In *Mitchell*, a prospective juror, Mr. Maloney, stated during *voir dire* that he had never been a victim of a crime. *Mitchell*, 121 Ill. App. 3d at 194. After the panel of jurors of which Mr. Maloney was a member was accepted and sworn, defendant obtained information indicating that Mr. Maloney had been the victim of a burglary. *Id.* Defendant asked the trial court to reopen the *voir dire* of Mr. Maloney to inquire about the burglary. *Id.* The trial court denied the motion. *Id.* The appellate court reversed and remanded, holding that where *voir dire* is still in progress or just completed, an inquiry is called for where facts contradicting the answers given on *voir dire* come to the attention of the trial court. *Id.* at 195. The appellate court concluded that the trial court abused its discretion in refusing to reopen the *voir dire* of Mr. Maloney for the limited purpose of inquiry into the burglary. *Id.* at 196.

¶ 83     In *Green*, the trial court denied defendant's motion to reopen the *voir dire* of three venirepersons who had stated on their jury cards that they were the victims of a crime, but who had failed to indicate they were crime victims when questioned in open court. *Green*, 282 Ill. App. 3d at 513. Citing *Mitchell*, the appellate court reversed and remanded, holding:

"A limited inquiry would have satisfied the purpose of *voir dire* to expose potential bias

or prejudice, would have resulted in only a minor delay in jury selection and would have

resolved the issue as to whether [the three venirepersons] were in fact crime victims, as

well as the effect such involvement would have had on their ability to be impartial." *Id.* at

514.

The appellate court concluded:

"[T]he trial court abused its discretion when it refused to reopen *voir dire* of the three

jurors for the limited purpose of inquiring as to the contradiction between their

affirmative responses on their jury cards that they had been the victims of a crime and

their failure to so state in open court when asked by the trial judge." *Id.*

¶ 84    Unlike in *Mitchell* and *Green*, plaintiffs here were not asking the trial court to reopen

*voir dire*, prior to trial, based on specific evidence indicating that the jurors had given untrue

answers to some of the court's questions; rather, plaintiffs were seeking an interruption, after

trial, of jury deliberations based on a statement from three jurors that they were fearful, for

unknown reasons, of "the men in the gallery" and that the jurors wanted a "secret way" to enter

and exit the court. Where plaintiffs' request came in the middle of jury deliberations and

provided no concrete example that the jurors had been threatened by the men in the gallery or

had any contact with them, the trial court committed no abuse of discretion when, instead of

interrupting the deliberations to question the jurors, it addressed their safety concerns by

instructing them regarding the closing of the courtroom and the escorted use of the private

elevator.

¶ 85    Plaintiffs also cite *McGee v. City of Chicago*, 2012 IL App (1st) 111084, but *McGee*, too,

is factually inapposite. In *McGee*, plaintiff brought claims of malicious prosecution and

intentional infliction of emotional distress against defendants. *Id.* ¶ 2. The issue of plaintiff's memory lapses was introduced at trial. *Id.* ¶¶ 9-14. During the trial, the bailiff informed the trial court that a juror had told him that another juror had performed her own internet research on the issue of memory lapses and had brought the information into the jury room. *Id.* ¶ 17. The trial court ultimately decided not to question the juror about the research brought into the jury room. *Id.* ¶ 21. The appellate court reversed and remanded, holding that once it became apparent that extraneous information on memory lapses had reached the jury, the trial court should have sustained defendants' request to *voir dire* the juror in chambers. *Id.* ¶ 33. "At a minimum, the circuit court should have determined what was brought into the jury room, what it contained, and who had read it. The court could then determine whether the extraneous information was prejudicial." *Id.*

¶ 86    *McGee* is factually inapposite, as the trial court there refused to question a juror prior to deliberations about the extraneous information she brought into the jury room, whereas here the trial court was asked to interrupt the second day of deliberations to question the jurors. Also unlike *McGee*, where there was evidence of specific extraneous, unlawful information reaching the jury, no such evidence was offered here in support of plaintiffs' request for an interruption of jury deliberations. Rather, as discussed, there was only a report of a vague statement by three of the jurors as to their feeling scared of "the men in the gallery," with no allegation or evidence that those men (or anyone else) had asserted any improper influence on them. For all the reasons discussed earlier in this opinion, the trial court committed no abuse of discretion by denying plaintiffs' motion to interrupt the jury deliberations and question the three jurors, and by instead giving the jury an instruction addressing their safety concerns.

¶ 87            II. Refusal to Question Jurors Regarding Anti-Middle Eastern Bias

¶ 88    Next, we address plaintiffs' argument that the trial court erred on the second day of deliberations when it denied their request, in their oral "follow-on" motion supplementing their written motion for a mistrial, to question three jurors about their anti-Middle Eastern bias. Plaintiffs contend that due process requires that a party be allowed to question jurors to determine whether racial bias is present. Plaintiffs cite in support *Smith v. Phillips*, 455 U.S. 209, 215 (1982), in which the United States Supreme Court held that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."

¶ 89    However, careful review of the trial record unequivocally shows that, in their written motion for a mistrial and their "follow-on" oral motion made on the second day of jury deliberations, plaintiffs never alleged any anti-Middle Eastern bias on the part of the three jurors in question and, thus, forfeited review of the issue. See *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 31 (the failure to raise an issue at trial results in forfeiture of appellate review). Rather, plaintiffs argued in their written mistrial motion that the three jurors' stated fear of the men in the gallery, coupled with the video testimony of Ms. Bodily regarding the perceived threat coming from Mr. Nora and Mr. Hawatmeh, and Playboy's closing argument calling Mr. Hawatmeh a "scoundrel," indicated that "the jury process has been tainted and that a fair verdict based on the evidence may not be rendered." The written motion for a mistrial contained no mention or argument of any type of anti-Middle Eastern bias on the part of the three jurors in question.

¶ 90    In their oral "follow-on motion," plaintiffs requested that the three jurors be questioned by either the court or counsel as to "the reasons for their concern, to determine if they have become either biased or no longer capable of rendering a fair verdict." Importantly, when making their motion, plaintiffs made absolutely no mention of the Middle Eastern descent of the men in the gallery or of any concern that the three jurors were biased against them because they were

from the Middle East; no such mention of any anti-Middle Eastern bias was raised in the lengthy colloquy that ensued regarding plaintiffs' motion. Thus, plaintiffs have forfeited review of the issue and cannot now argue on appeal that the trial court erred by failing to interrupt the jury deliberations to question those jurors about such a bias. *Id.*

¶ 91 Plaintiffs first raised the issue of the jurors' alleged anti-Middle Eastern bias in their posttrial motion, when they argued for a new trial based on Playboy's putting on of a "nativist case" that was "meant to play to Middle Eastern stereotypes" and that fueled the jurors' bias. Plaintiffs also argued that Playboy fed the jurors' anti-Middle Eastern bias by continually referring to Mr. Hawatmeh by his given name and labeling him as a "scoundrel" during opening statement and closing arguments. Plaintiffs contended that the fears expressed by the three jurors might have been driven by anti-Middle Eastern bias fueled by Playboy during the trial and that the trial court erred by denying plaintiffs' request to interrupt the jury deliberations to "rehabilitate these jurors by asking about the basis for their concerns."

¶ 92 The trial court denied plaintiffs' posttrial motion, finding, first, that plaintiffs had failed to raise the issue of the jurors' alleged anti-Middle Eastern bias during trial (*i.e.*, that the issue was forfeited) and, second, that even addressing the issue on the merits, plaintiffs had shown no such "nativist case" put on by Playboy or any anti-Middle Eastern bias on the part of the jurors. As discussed earlier in this opinion, the trial court did not err in finding that plaintiffs had forfeited review of this issue where it was not raised at trial. *Id.* Plaintiffs also forfeited review of Playboy's comments in opening statement and closing argument regarding Mr. Hawatmeh by failing to object thereto. *Id.*

¶ 93 Choosing to address the issue of the jurors' alleged anti-Middle Eastern bias on the merits, as did the trial court, we note that the burden of proof was on plaintiffs to support the

allegations of bias in their posttrial motion. *People v. Rodgers*, 288 Ill. App. 3d 167, 171 (1997). Generally, we will not reverse the court's ruling on the posttrial motion absent an abuse of discretion. *Dixon v. Union Pacific R.R. Co.*, 383 Ill. App. 3d 453, 470 (2008). However, plaintiffs' claim that they may have been tried by a biased jury involves an alleged due process violation, which presents a question of law reviewed *de novo*. *My Baps Construction Corp. v. City of Chicago*, 2017 IL App (1st) 161020, ¶ 96. For the reasons that follow, under either standard of review, we affirm the trial court's denial of plaintiffs' posttrial motion.

¶ 94    As discussed, plaintiffs' argument was that Playboy put on a "nativist case," fueling the jurors' actual anti-Middle Eastern bias and prejudice; however, their argument lacked merit, and the trial court did not err in finding that plaintiffs failed to meet their burden of proof and in denying plaintiffs' posttrial motion, where (1) a pretrial *in limine* order was entered excluding any reference to the ethnicity and national origin of Mr. Hawatmeh and Mr. Nora, and Playboy completely honored the *in limine* order by never mentioning the ethnicity, national origin, or religion of Mr. Hawatmeh, Mr. Nora, or anyone else; (2) the only mention of anyone's national origin came from plaintiffs, who told the prospective jurors twice during *voir dire* that certain witnesses speak with an accent because they are from "outside the United States," and asked whether this would cause them not to believe such witnesses, and no prospective juror responded in the affirmative; (3) there was no trial testimony concerning the ethnicity of the witnesses or of the men in the gallery; (4) Playboy never referred to the men in the gallery; and (5) the men in the gallery were only referred to twice during the trial, both times by plaintiffs' trial counsel, when he pointed them out during his closing argument and referred to them as plaintiffs' investors but did not mention their ethnicity or identify them by name.

¶ 95    Plaintiffs argue that Playboy's repeated use of Mr. Hawatmeh's name, and its reference to him during opening statement and closing arguments as a "scoundrel," sent a signal to the jury that Mr. Hawatmeh was an untrustworthy Middle Easterner and fueled the jurors' bias. We disagree. Playboy used Mr. Hawatmeh's given name but never referred to his ethnicity. Also during opening statement, Playboy called Mr. Hawatmeh a "scoundrel," not because he was Middle Eastern, but because he "kept using Playboy's trademarks in his distributor network, just as though he owned the trademark, and he never paid Playboy another dime in licensing fees. For three years he's been using the Playboy trademarks without an agreement and without paying for them." Similarly, during closing argument, Playboy called Mr. Hawatmeh a "scoundrel" because he "continued to use Playboy's trademarks without a license, without paying Playboy a penny since mid-2011." No reference was made in either opening statement or closing argument to Mr. Hawatmeh being from the Middle East.

¶ 96    On this record, there is no basis to conclude that Playboy put on a "nativist case" that indicated to the jury that it should find against plaintiffs based on the ethnicity of Mr. Hawatmeh and/or PlayBev's investors.

¶ 97    Nor was there any basis to conclude that the jurors otherwise harbored any anti-Middle Eastern bias against Mr. Hawatmeh and/or PlayBev's investors, where the jurors did not indicate to the clerk that their fear of the men who had been sitting in the gallery was predicated on anyone's ethnicity or on an anti-Middle Eastern bias, and plaintiffs offered no affidavits or other evidence in support of their contention of jury bias.

¶ 98    Accordingly, the trial court did not err in denying plaintiffs' posttrial motion.

¶ 99    *Pena-Rodriguez v. Colorado*, 580 U.S. ___, 137 S. Ct. 855 (2017), cited by plaintiffs, does not compel a different result. In *Pena-Rodriguez*, a jury convicted the petitioner of unlawful

sexual contact and harassment. *Id.* at ___, 137 S. Ct. at 861. Following the discharge of the jury, two jurors told petitioner's counsel that, during deliberations, another juror, H.C., had expressed anti-Hispanic bias toward petitioner and petitioner's alibi witness. *Id.* at ___, 137 S. Ct. at 861. Counsel subsequently obtained affidavits from the two jurors describing a number of biased statements by H.C. *Id.* at ___, 137 S. Ct. at 862. After reviewing the affidavits, the trial court acknowledged H.C.'s apparent bias, but denied petitioner's motion for a new trial because Colorado's version of Rule 606(b) generally prohibits a juror from testifying about statements made during deliberations in a proceeding inquiring into the validity of the verdict. *Id.* at ___, 137 S. Ct. at 862.

¶ 100   The United States Supreme Court reversed and remanded, holding:

> "[W]here a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule [set forth in Rule 606(b), which prevents impeachment of verdicts based on a juror's subjective mental processes] give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id.* at ___, 137 S. Ct. at 869.

The Supreme Court further held:

> "Not every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether that

threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence." *Id.* at ___, 137 S. Ct. at 869.

¶ 101    *Pena-Rodriguez* is inapposite, as it involves the sixth amendment rights applicable at a criminal trial, whereas the present case involves a civil trial for which the sixth amendment is not implicated. *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 856 (2010). Even if we were to apply *Pena-Rodriguez* here, the result would be the same, as plaintiffs made no showing in support of their mistrial motion (via affidavit or, otherwise) that any juror made any statements exhibiting overt racial bias or indicating any reliance on racial stereotypes and animus and, thus, no further judicial inquiry (including the interruption of the jury deliberations to question the jurors) was necessary.

¶ 102                III. Admission of the Testimony of Ms. Bodily

¶ 103    Next, we address plaintiffs' argument that the trial court erred by admitting the testimony of Ms. Bodily regarding Mr. Nora's effort to intimidate her into not testifying by asking her if she knew how "connected" Mr. Hawatmeh was and who he knows and "what he is capable of." The trial court's admission of evidence will not be reversed absent an abuse of discretion. *Gapinski v. Gujrati*, 2017 IL App (3d) 150502, ¶ 45.

¶ 104    Mr. Nora's statement to Ms. Bodily regarding Mr. Hawatmeh's being "connected," and alluding to who he knows and what he is "capable of," could be perceived as a threat from plaintiffs to keep her from testifying. Our supreme court has held that threats by a party to a suit are relevant and admissible as a consciousness of guilt (*People v. Gambony*, 402 Ill. 74, 80 (1948)). Plaintiffs argue that *Gambony* was a criminal case and that, since the present case is a

civil proceeding, *Gambony* is inapposite and any threats by plaintiffs are inadmissible. We disagree, as the supreme court in *Gambony* expressly held that "[a]ny attempt by a party to a suit, *either civil* or criminal, to conceal or, by threats or otherwise, to suppress evidence or obstruct an investigation of an issue, is relevant upon the trial of such issue." (Emphasis added.) *Id.* Accordingly, the trial court committed no abuse of discretion by admitting the testimony of Ms. Bodily regarding plaintiffs' threat.

¶ 105                                    CONCLUSION

¶ 106    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 107    Affirmed.