2023 IL App (1st) 221407-U

FIRST DISTRICT,
FIRST DIVISION
August 7, 2023

No. 1-22-1407

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| REBA SHAVERS, on behalf of herself and others similarly situated, | ) ) ) | |
| | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Cook County, Illinois. |
| | ) | |
| THE UPS STORE, INC., GENERATION I LLC, | ) | No. 2020 CH 05119 |
| d/b/a UPS STORE #7181 IN ITS OWN RIGHT | ) | |
| AND AS A REPRESENTATIVE OF A CLASS OF | ) | Honorable |
| SIMILARLY SITUATED UPS STORE | ) | Thaddeus L. Wilson, |
| FRANCHISEES, and JOHN DOES 1-200, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justice Pucinski concurred in the judgment.
Justice Hyman concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*:  Plaintiff alleged that she had been charged an unlawfully high fee for notary services at a retail franchise store and brought a class action suit against the franchisor. We hold that the complaint allegations failed to state claims for violations of the Illinois Consumer Fraud Act, the Notary Public Act, and for unjust enrichment, but sufficiently stated a claim for civil conspiracy.

¶ 2    Plaintiff Reba Shavers brought a class action complaint against The UPS Store, Inc. ("TUPSS"), alleging that the company, through its franchise locations, overcharged for notarizing documents in violation of the Illinois Notary Public Act (Notary Act) (5 ILCS 312/3-104(a) (West 2018)). The trial court dismissed plaintiff's claims against TUPSS, finding that she "failed to plead facts of how the franchisor TUPSS, Inc. directed, condoned, or otherwise failed to properly supervise any notary in the performance of their duties" and that her allegations regarding TUPSS's control and direction over individual franchise locations were "conclusory" and not "factual." For the reasons that follow, we affirm in part and reverse in part.

¶ 3                                BACKGROUND

¶ 4    Prior to January 1, 2022, the Notary Act provided that "the maximum fee in this State is $1.00 for any notarial act performed," with exceptions not relevant here.[1] 5 ILCS 312/3-104(a) (West 2018). On April 2, 2020, plaintiff visited UPS Store #7181, a store operated by Generation I, LLC, a TUPSS franchisee. Plaintiff had two signatures notarized for documents related to an estate. For each document, she was charged a $1 notary fee and a $4 "clerical fee," even though no clerical services were provided beyond notary services.

¶ 5    On July 24, 2020, plaintiff filed the instant action, which, as amended, brought claims against TUPSS, Generation I, and "John Does 1-200," defined as "franchisees doing business as The UPS Store, Inc. in the state of Illinois." In her second amended complaint, plaintiff alleged that TUPSS is the franchisor of The UPS Store and has retail service centers throughout the United States, including 175 stores in Illinois. Pursuant to its franchise agreements, TUPSS "exercises a high degree of control over" UPS Store franchisees, including Generation I. The confidential operations manual provided to franchisees "expressly outlines" business information

---

[1] Effective January 1, 2022, the maximum fee was increased to $5 for non-electronic notarization and $25 for electronic notarization. 5 ILCS 312/3-104(a), (b) (West 2022).

necessary to run a UPS Store franchise, "including pricing." TUPSS requires franchisees to provide notary services, and it "controls and has the right to control conduct of its franchisees, including but not limited to setting the prices for notary services," which it "regulates *** through compliance audits."

¶ 6 Plaintiff further alleged that "[u]pon information and belief, the charge for a document notarized at a location operating as The UPS Store in Illinois is $5.00," itemized as a $1 notary fee and a $4 "clerical fee," even though no clerical services other than notary services are provided. Moreover, "TUPSS is aware that each location in Illinois misrepresents that a 'Clerical Fee' or other fee is charged for purely notarial services through a common point-of-sale system used by franchisees that uses uniform transaction codes."

¶ 7 Plaintiff sought relief in four counts on behalf of herself and a proposed class of individuals overcharged for notary services by defendants. In count I, violation of the Consumer Fraud and Deceptive Business Practices Act (ICFA) (815 ILCS 505/1 (West 2020)), she alleged that it is an "unfair and deceptive practice" to misrepresent to consumers that clerical services will be (or have been) performed for a fee when no such services are performed. In count II, plaintiff alleged that defendants overcharge for notary services in violation of section 3-104(a) of the Notary Act (5 ILCS 312/3-104(a) (West 2018)). In count III, unjust enrichment, plaintiff alleged that defendants were unjustly enriched by the fees they charged in violation of the ICFA and Notary Act. In count IV, civil conspiracy, plaintiff alleged that defendants "entered into a conspiracy by agreeing with each other each to wrongfully charge statutorily excessive fees for notary services provided at the stores owned and/or operated by Representative Defendants and the Franchisee Defendants." As relief, plaintiff requested that the court issue a declaratory

judgment that defendants' actions violated her rights and those of the proposed class, enjoin defendants from charging excessive fees, and award compensatory and punitive damages.

¶ 8        Defendants moved to dismiss the complaint for failure to state a cause of action under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2020)), arguing, in relevant part, that plaintiff failed to allege sufficient facts to hold TUPSS liable for Generation I's alleged misconduct on a theory of agency.

¶ 9        On August 16, 2022, the trial court dismissed with prejudice all claims against TUPSS and entered a finding pursuant to Illinois Supreme Court Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016)) that there was no just reason for delaying enforcement or appeal. In regards to plaintiff's Notary Act claim, the court stated that plaintiff "failed to plead facts of how the franchisor TUPSS, Inc. directed, condoned, or otherwise failed to properly supervise any notary in the performance of their duties." Additionally, "[w]hile Plaintiff made numerous conclusory allegations regarding how the franchisor defendant exercises control and direction over the individual franchisee stores, none of those allegations are factual in nature." Thus, the court found that "[p]laintiff's agency claims are insufficient to hold [TUPSS] responsible in this case" and "this Court does not believe Plaintiff [will] be able to cure this deficiency if granted another opportunity to amend this aspect of her complaint."

¶ 10        In the same order, the trial court dismissed counts II (Notary Act) and IV (civil conspiracy) against Generation I, finding that plaintiff failed to allege "misconduct by the actual notary involved in the transaction" and also "failed to allege with sufficient specificity a cause of action for civil conspiracy," but granted leave to replead.

¶ 11        Plaintiff filed a third amended complaint against Generation I on September 13, 2022, which shall be discussed as relevant below. She filed the instant appeal on September 15, 2022.

¶ 12                                ANALYSIS

¶ 13        Plaintiff argues that the trial court erred in dismissing TUPSS from the action, or, in the alternative, erred in designating the dismissal as "with prejudice" when her third amended complaint demonstrates that she was able to cure the deficiencies in the second amended complaint. In ruling upon a section 2-615 motion to dismiss, the court considers whether the allegations in the complaint state a cause of action upon which relief may be granted. *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). "Because Illinois is a fact-pleading jurisdiction, a plaintiff must allege facts, not mere conclusions, to establish his or her claim as a viable cause of action." *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305 (2008). All well-pleaded facts in the complaint and all reasonable inferences that may be drawn from those facts are taken as true, and we construe the allegations in the complaint in the light most favorable to plaintiff. *Young v. Bryco Arms*, 213 Ill. 2d 433, 441 (2004). We review the trial court's grant of a section 2-615 motion to dismiss *de novo*. *Id.* at 440.

¶ 14                          Illinois Consumer Fraud Act

¶ 15        The ICFA prohibits "unfair or deceptive acts or practices *** in the conduct of any trade or commerce." 815 ILCS 505/2 (West 2020). Section 10(a) permits any person who suffers damage due to a violation of the ICFA to bring suit against the violator. 815 ILCS 505/10(a) (West 2006); see *Fandel v. Allen*, 398 Ill. App. 3d 177, 187 (2010). The elements of a claim under the ICFA are (1) a deceptive act or practice by the defendant (2) in the course of conduct involving trade and commerce, (3) the defendant's intent that plaintiff rely on the deception, and (4) actual damage to plaintiff (5) proximately caused by the deception. *Capiccioni v. Brennan Naperville, Inc.*, 339 Ill. App. 3d 927, 933 (2003).

¶ 16        Plaintiff alleges that defendants violated the ICFA by misrepresenting to purchasers of notary services that clerical services would be and/or were performed when such services were not requested and not performed. Plaintiff further alleges that the purported "clerical services" were an attempt to disguise an unlawful notary service fee. See *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 504 (1996) ("An omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud").

¶ 17        TUPSS argues that plaintiff fails to allege that TUPSS played any direct, active role in the alleged misrepresentations, as is necessary to state a cause of action under the ICFA. Our supreme court has held that, although a plaintiff is entitled to maintain a cause of action against a defendant whose fraud is "active and direct," it is insufficient merely to allege that defendant knowingly profited from a third party's fraud. *Jackson v. South Holland Dodge, Inc.*, 197 Ill. 2d 39, 52 (2001); see also *Zekman v. Direct American Marketers, Inc.*, 182 Ill. 2d 359, 369 (1998).

¶ 18        In *Zekman*, plaintiff sued Direct American Marketers, alleging that they sent him a series of deceptive mailings indicating that he had won a prize and urging him to claim it by calling a "900" number for which he incurred charges. *Zekman*, 182 Ill. 2d at 363-64. Plaintiff also named AT&T as a defendant, alleging that it "knowingly received the benefits of Direct American's deceptive practices." *Id.* at 366-67. Our supreme court affirmed the dismissal of plaintiff's claim against AT&T, holding that "knowingly receiving the benefits of another's fraud is not actionable" under section 2 of the ICFA, which is "limited to conduct that defrauds or deceives consumers or others." (Internal quotation marks omitted.) *Id.* at 369.

¶ 19        Similarly, in *Jackson*, 197 Ill. 2d at 40-41, plaintiff filed suit against a car dealership and Chrysler, alleging violations of the ICFA related to her purchase of a warranty for her vehicle. Our supreme court affirmed the dismissal of plaintiff's claims against Chrysler, finding that

"there are no specific factual allegations that *** Chrysler directly participated in a scheme with the dealership to misrepresent facts to the plaintiff. Instead, the plaintiff's conclusory allegations of 'actual knowledge' are at best nothing more than a claim that Chrysler knowingly received the benefits of another's fraud." *Id.* at 52.

¶ 20     Here, plaintiff alleges that the confidential operations manual promulgated by TUPSS "expressly outlines *** pricing" for franchise stores. More specifically, "TUPSS mandates that each location in Illinois charge notary fees of $5.00 *** for each notarial act performed." However, contrary to the dissent's assertion, plaintiff does not allege that TUPSS directed franchisees in general, or Generation I specifically, to misrepresent part of the $5 fee as being for nonexistent clerical services. At best, she alleges that TUPSS is "aware" of the misrepresentation and receives "substantial" revenue therefrom, which is insufficient to state a cause of action under the ICFA. *Jackson*, 197 Ill. 2d at 52; *Zekman*, 182 Ill. 2d at 369.

¶ 21     Plaintiff nevertheless argues that TUPSS may be held liable for the misconduct of Generation I and other franchisees under a theory of agency. The doctrine of *respondeat superior* allows a principal to be held vicariously liable for the conduct of its agent. *Oliveira-Brooks v. Re/Max Int'l, Inc.*, 372 Ill. App. 3d 127, 134 (2007). "The test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." (Internal quotation marks omitted.) *Id.*; see also *Slates v. Int'l House of Pancakes, Inc.*, 90 Ill. App. 3d 716, 726 (1980) ("Where a sufficient degree of control and direction is manifested by the parent franchisor, an agency relationship may be created"). Although the franchise agreement between TUPSS and its franchisees expressly disclaims any agency relationship, such a disclaimer "is not controlling where the conduct of the parties demonstrates the existence of an

agency relationship." *Oliveira-Brooks*, 372 Ill. App. 3d at 134. The existence of an agency relationship is generally one of fact, but becomes one of law where the relevant facts are not in dispute. *Anderson v. Boy Scouts of America, Inc.*, 226 Ill. App. 3d 440, 444 (1992).

¶ 22    In *Salisbury v. Chapman Realty*, 124 Ill. App. 3d 1057 (1984), we held that plaintiff failed to allege sufficient facts to hold the defendant franchisor vicariously liable for the acts of its franchisee (Chapman). Chapman agreed to conduct its business in accordance with the franchisor's confidential operations manual and maintain its office, furnishings, and supplies in accordance with franchise standards. *Id.* at 1061. Chapman could send its employees to training sessions conducted by the franchisor, and the franchisor had the right to inspect Chapman's accounts. *Id.* Under these facts, we held that the franchisor's control was "considerable but not total" and not sufficiently complete "so as to negate the intent of the franchise agreement not to create a principal agent relationship." *Id.* We explained that the franchisor did not control Chapman's day-to-day operations or hire Chapman employees; rather, Chapman "maintains its individual identity and supervises its own operations subject to general standards set by [the franchisor]." *Id.*

¶ 23    Similarly, in *Slates*, 90 Ill. App. 3d 716, we found no agency relationship between a restaurant franchisor and franchisee. The record reflected that the franchisee was required to purchase supplies from approved suppliers and sell only approved products. *Id.* at 727. Additionally, the franchisor promulgated a binding operational procedures manual covering

"training and supervision of franchisees and restaurant managers, quality control, record keeping and account controls, administrative assistance, periodic inspections, appearance of the premises, hours of operation, merchandise sold, employees appearance and

demeanor, the personal standards in training, promotions, advertisings and signs, preparation and service of food and beverages, and relations with suppliers." *Id.* Nevertheless, "this control was not so all encompassing as to negate the express intention of the parties in the franchise agreement that no agency relationship was created." *Id.*

¶ 24 We find the allegations of control in plaintiff's complaint to be analogous to those in *Salisbury* and *Slates*. Although plaintiff states, in conclusory fashion, that TUPSS "manag[es] day-to-day operations" of its franchisees, the allegations in her complaint do not establish this level of control. See *Napleton*, 229 Ill. 2d at 305 ("a plaintiff must allege facts, not mere conclusions, to establish his or her claim as a viable cause of action"). According to the complaint, TUPSS assists franchisees in site selection, lease negotiations, financing, and networking and provides them with "a variety of services and training." It promulgates a confidential operations manual that contains "business information and know-how necessary for successfully operating a store doing business as The UPS Store, including business modeling, pricing, [and] market strategies." Additionally, TUPSS "is responsible for pricing policies" of its franchisees, which it enforces through compliance audits. Construed in the light most favorable to plaintiff (*Young*, 213 Ill. 2d at 441), these allegations do not show that TUPSS exercises "such complete control over [the franchisee] so as to negate the intent of the franchise agreement not to create a principal agent relationship." *Salisbury*, 124 Ill. App. 3d at 1061. Rather, franchisees "supervise[] [their] own operations subject to general standards set by [TUPSS]." *Id.*

¶ 25 Plaintiff argues that *Slates* is inapposite because it involved the issue of whether the franchisee was an agent for service of process. We rejected this argument in *Salisbury*, 124 Ill. App. 3d at 1062, finding the court's agency analysis to be "of critical importance" to the service of process issue rather than "mere dicta." Plaintiff additionally argues that *Salisbury* is factually

distinguishable because there, the franchisor provided training on a "voluntary basis" (*id.* at 1061), whereas here it is mandatory. We do not find this difference sufficient to establish the "all encompassing" control required for an agency relationship between franchisor and franchisee. *Slates*, 90 Ill. App. 3d at 727. Accordingly, plaintiff has not alleged facts that would make TUPSS vicariously liable for its franchisees' alleged ICFA violations, and the trial court properly dismissed plaintiff's claims against TUPSS under the ICFA.

¶ 26                                    Notary Act

¶ 27        In 2020, the Notary Act provided that "the maximum fee in this State is $1.00 for any notarial act performed," with exceptions not relevant here. 5 ILCS 312/3-104(a) (West 2018). Plaintiff alleges that, in violation of this provision, she was charged $5 for each notarial act.

¶ 28        TUPSS argues that plaintiff has failed to state a cause of action under the Notary Act because TUPSS is not within the limited set of defendants that may be held liable under the statute. Section 7-101 of the Notary Act provides that "[a] notary public and the surety on the notary's bond are liable to the persons involved for all damages caused by the notary's official misconduct." 5 ILCS 312/7–101 (West 2018). Section 7-102 provides that the employer of the notary public may be held vicariously liable for such misconduct if "the notary public was acting within the scope of the notary's employment" and "the employer consented to the notary public's official misconduct." 5 ILCS 312/7–102 (West 2018).

¶ 29        Here, TUPSS is not a notary or a surety of a notary's bond, nor does plaintiff allege that TUPSS employs any notary who charges an unlawful fee for their services. Instead, plaintiff alleges that TUPSS, which has the right to control and does in fact control pricing at franchise stores, explicitly directed Illinois franchisees to charge unlawfully high notarial fees. Although these allegations are relevant to plaintiff's claim of civil conspiracy, as shall be discussed below,

they do not place TUPSS within any of the categories of defendants that may be held liable under the Notary Act.

¶ 30　　Plaintiff argues that TUPSS may be held vicariously liable for Generation I's misconduct under a theory of agency. However, as discussed, plaintiff has not alleged the kind of "all encompassing" control required to overcome the franchise agreement's explicit disclaimer of agency. *Slates*, 90 Ill. App. 3d at 727. Thus, plaintiff's Notary Act claim against TUPSS was properly dismissed.

¶ 31　　　　　　　　　　　　　　　　Unjust Enrichment

¶ 32　　Plaintiff next argues that the trial court erred in dismissing her unjust enrichment claim against TUPSS. To recover on a theory of unjust enrichment, plaintiff must demonstrate "that the defendant unjustly retained a benefit to the plaintiff's detriment and that the defendant's retention of the benefit violates the principles of justice, equity, and good conscience." *Lewis v. Lead Industries Ass'n, Inc.*, 342 Ill. App. 3d 95, 105 (2003). However, unjust enrichment "is not a separate cause of action that, standing alone, will justify an action for recovery." *Martis v. Grinnell Mutual Reinsurance Co.*, 388 Ill. App. 3d 1017, 1025 (2009). Where plaintiff seeks recovery for unjust enrichment based on the alleged violation of a statute but fails to state a claim for the underlying violation, the unjust enrichment claim necessarily falls as well. *Id.* In *Martis*, "[p]laintiff alleged that defendant violated the Illinois Consumer Fraud Act, but the trial court found that plaintiff could not prevail on that count. Because there was no valid underlying fraud claim, the trial court properly dismissed plaintiff's unjust enrichment claim." *Id.* Similarly, since plaintiff failed to state valid causes of action against TUPSS under the ICFA and the Notary Act, her unjust enrichment claim was properly dismissed.

¶ 33                                    Civil Conspiracy

¶ 34          Civil conspiracy "is the combination of two or more persons or entities for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Lewis*, 342 Ill. App. 3d at 107. "The civil conspiracy theory has the effect of extending liability for a tortious act beyond the active tortfeasor to individuals who have not acted but have only planned, assisted, or encouraged the act." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999). To state a claim for civil conspiracy, a plaintiff must allege both an agreement and that one of the parties to the agreement committed a tortious act in furtherance of the agreement. *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62-64 (1994). A civil conspiracy claim is not an independent cause of action but must be based upon an underlying tort. *Thomas v. Fuerst*, 345 Ill. App. 3d 929, 936 (2004). Thus, where a plaintiff fails to state a valid cause of action for the underlying tort, her conspiracy claim also fails. *Id.*

¶ 35          Here, plaintiff alleges that TUPSS, Generation I, and other TUPSS franchisees made an agreement to charge unlawfully high notary fees in violation of the Notary Act. In its August 16, 2022 order, the trial court found that the second amended complaint failed to state a valid cause of action underlying its conspiracy claims. In particular, plaintiff's Notary Act claim against Generation I was deficient because plaintiff failed to allege "misconduct by the actual notary involved in the transaction."

¶ 36          Plaintiff subsequently filed a third amended complaint against Generation I, adding claims against Rex Ingram, the co-owner of Generation I and the notary who notarized plaintiff's documents. Generation I and Rex Ingram filed a motion to dismiss, which the trial court denied.[2] The court found that, by alleging misconduct by Ingram, plaintiff "has in fact remedied the

_____

[2] We granted plaintiff's motion to supplement the record with the trial court's order.

pleading deficiencies that this Court identified within its August 16, 2022 order" in regards to her Notary Act and civil conspiracy claims.

¶ 37 We agree with the trial court's reasoning and find that plaintiff has stated a valid cause of action against Generation I under the Notary Act which underlies her civil conspiracy claims against TUPSS and Generation I. Although a cause of action does not lie directly against TUPSS under the Notary Act, TUPSS may be held liable for conspiring with its franchisees to violate said Act. "[W]here means are employed, or purposes are accomplished, which are themselves tortious, *** the conspirators who have not acted but have promoted the act will be held liable." (Internal quotation marks omitted.) *Adcock*, 164 Ill. 2d at 63.

¶ 38 TUPSS next argues that plaintiff's conspiracy claim is pleaded with insufficient specificity. See *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 59 ("[T]o allege a conspiracy, the complaint must set forth with particularity the facts and circumstances constituting the alleged conspiracy" (internal quotation marks omitted)). In her third amended complaint, plaintiff alleges that TUPSS "monitor[s]" and "approve[s]" the prices that its franchisees charge for notarial acts through "a common point-of-sale system that uses uniform transaction codes," and it "direct[s], allow[s], encourage[s], and enable[s]" its franchisees and notaries acting on their behalf to charge statutorily excessive fees.[3] She further alleges that TUPSS regulates pricing through compliance audits, citing an April 10, 2017 email by the owner of a UPS Store franchise. We find these allegations sufficiently specific to survive a motion to dismiss. Accordingly, we reverse the trial court's dismissal of plaintiff's civil conspiracy claim against TUPSS.

---

[3] In the third amended complaint, plaintiff abandons her allegation that TUPSS mandates that all Illinois franchisees charge $5 for each notarial act performed. Instead, she provides examples of various franchisees charging amounts from $4 to $36, all above the statutory maximum of $1.

¶ 39                    Designation of Dismissal as "With Prejudice"

¶ 40          Finally, plaintiff argues that the trial court erred by dismissing her claims against TUPSS

with prejudice instead of granting her leave to amend her complaint. Whether to grant leave to

amend the pleadings lies within the sound discretion of the trial court. *Shutkas Electric, Inc. v.*

*Ford Motor Co.*, 366 Ill. App. 3d 76, 82 (2006). In determining whether an abuse of discretion

has occurred, we consider (1) whether the proposed amendment would cure the defective

pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed

amendment; (3) whether the proposed amendment is timely; and (4) whether previous

opportunities to amend the pleading could be identified. *Loyola Academy v. S & S Roof*

*Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992).

¶ 41          Plaintiff argues that her third amended complaint cured the defects in her second

amended complaint. As discussed, it did, in fact, cure the defect in her civil conspiracy claim.

However, plaintiff's other claims remain defective. In regards to her ICFA claim, plaintiff

alleges that TUPSS is "fully aware that at least some of the Franchisee Defendants

misrepresent[] that a 'Clerical Fee' or other fee is charged for purely notarial services" but does

not allege any direct involvement by TUPSS in such fraud. As discussed, "knowingly receiving

the benefits of another's fraud" is not actionable under the ICFA. *Zekman*, 182 Ill. 2d at 269.

Additionally, plaintiff does not allege that TUPSS is a notary, surety, or an employer of a notary,

as would be required to state a claim against TUPSS under the Notary Act. 5 ILCS 312/7–101,

102 (West 2018).

¶ 42          Regarding her theory of agency, although plaintiff states in the third amended complaint

that TUPSS exerts "tight and heavy" control over franchisees and that its "extremely high" level

of control "cannot be seriously disputed," these conclusory statements are insufficient to defeat a

motion to dismiss (see *Napleton*, 229 Ill. 2d at 305). Plaintiff makes additional factual allegations that TUPSS regulates the location, design, and appearance of franchise stores; requires franchisees to pay royalties and fees to TUPSS; collects data on customers; and retains the right to access data on franchisees' "POS Systems." These allegations, like the ones in the second amended complaint, do not reflect "all encompassing" (*Slates*, 90 Ill. App. 3d at 727) control over franchisees' day-to-day operations. Finally, plaintiff's unjust enrichment claim necessarily fails, as it is derivative of her ICFA and Notary Act claims. See *Martis*, 388 Ill. App. 3d at 1025.

¶ 43 Since plaintiff's third amended complaint did not cure the second amended complaint's defects in regards to counts I, II, and III, we need not address the remaining *Loyola Academy* factors, and we find no abuse of discretion in designating the dismissal of counts I, II, and III as "with prejudice." See *Myers v. Illinois Central R. Co.*, 323 Ill. App. 3d 780, 788 (2001).

¶ 44                                         CONCLUSION

¶ 45 For the foregoing reasons, we affirm the dismissal of plaintiff's count I (ICFA), count II (Notary Act), and count III (unjust enrichment) against TUPSS, but reverse the dismissal of count IV (civil conspiracy) and remand for further proceedings.

¶ 46 Affirmed in part, reversed in part, and remanded.

¶ 47 JUSTICE HYMAN concurring in part, dissenting in part:

¶ 48 I agree that Shavers's complaint fails to state a claim under the Illinois Public Notary Act (5 ILCS 312/3-104(a) (West 2018)), as the third amended complaint did not cure the defect. I also agree that Shavers's alleged civil conspiracy survives the motion to dismiss. But, I part with the majority on the Illinois Consumer Fraud Act (ICFA) and unjust enrichment claims. The majority's decision on the ICFA and unjust enrichment claims as alleged in the second amended complaint is based on a misreading of both the complaint and Illinois consumer fraud caselaw.

¶ 49                               Illinois Consumer Fraud Act

¶ 50         To state a claim under the ICFA, a plaintiff must allege: (i) a deceptive act or practice by the defendant, (ii) in the course of conduct involving trade and commerce, (iii) the defendant's intent that plaintiff relies on the deception, and (iv) actual damage to plaintiff (v) proximately caused by the deception. *Capiccioni v. Brennan Naperville, Inc.*, 339 Ill. App. 3d 927, 933 (2003).

¶ 51         In affirming, the majority finds Shavers's complaint does not satisfy the first element because she failed to allege TUPSS played a direct and active role in the alleged misrepresentations. According to the majority, Shavers did not allege "TUPSS directed franchisees in general, or Generation I specifically, to misrepresent part of the $5 fee as being for nonexistent clerical services." *Supra* ¶20. This misreads the second amended complaint.

¶ 52         Shavers alleges "TUPSS controls *** the conduct of its franchisees, including but not limited to setting the prices for notary services charged at [TUPSS] Store locations." Further, TUPSS mandates its Illinois locations charge a $5 notary fee, consisting of $1 for notarial services and $4 for other services, including "Clerical Services." These allegations not only suggest that TUPSS knew that in Illinois they could charge no more than $1 for notary services, but also suggest the additional $4 charged customers "a fee for services that Defendant never intended to perform and did not perform."

¶ 53         Courts take as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts, and construe the allegations in the light most favorable to plaintiff. *Young v. Bryco Arms*, 213 Ill. 2d 433, 441 (2004). The factual allegations in Shavers's second amended complaint and reasonable inferences drawn from them are (i) TUPSS controlled their franchisees, including setting prices for notary services, (ii) which exceeded the amount allowed

-16-

in Illinois, (iii) misrepresenting to customers nonexistent clerical services. Those allegations satisfy the deceptive act or practice requirement. See *Fitzgerald v. Chicago Title & Trust Co.*, 72 Ill. 2d 179, 380 N.E.2d 790 (1978) (plaintiffs stated claim under ICFA against title insurer that invoiced buyers and sellers of real property for services of which they were not aware and did not receive provided insurer's actions were taken with intent plaintiffs rely on invoices); *Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A.*, 186 Ill. 2d 472, 487 (1999) (plaintiffs stated claim under ICFA by alleging defendant broker's disclosure statement did not state that foreign service fee charged to plaintiffs was additional commission from which defendant would derive compensation; defendant used misleading term "foreign service fee," and deceived plaintiffs into believing fee was another separate charge defendants paid to third parties).

¶ 54       Like the defendants in *Fitzgerald* and *Weatherman*, TUPSS and its franchisees used a misleading term, "clerical services" and charged customers for services they did not receive, deceiving them into believing they paid for more than just notary services. Thus, Shavers's second amended complaint states a claim under the ICFA.

¶ 55       To reach its decision on dismissing the ICFA claim, the majority relies on two Illinois Supreme Court decisions: *Zekman v. Direct American Marketers, Inc.*, 182 Ill. 2d 359, 369 (2001) and *Jackson v. South Holland, Inc.*, 197 Ill. 2d 39 (2001). Both cases compel a contrary conclusion than that reached by the majority.

¶ 56       In *Zekman*, the Supreme Court held that allegations of mere knowledge of profit from third party's fraud was insufficient and the plaintiff must allege defendant's fraud was "active and direct." *Zekman*, however, does not support the majority's argument on dismissing the ICFA claim. TUPSS is not an unrelated third party but rather the franchisor alleged to have directly

participated in the fraud by setting prices for notary services and mandating franchisees charge $5, including $4 for non-existent clerical services.

¶ 57    Similarly, *Jackson* is readily distinguishable. In *Jackson*, the plaintiff alleged the defendant, Chrysler, was liable under the ICFA because it had "actual knowledge" of a car dealership's fraudulent conduct. Our supreme court found Chrysler complied with the federal Truth in Lending Act (TILA), which precluded liability under the ICFA, but added that the TILA would not bar recovery if Chrysler's fraud was active and direct. *Id.* at 50-52. Shavers's ICFA claim meets the pleading requirements because she alleged not only that TUPSS knew about its franchisees' fraudulent conduct but also played an active and direct role in it.

¶ 58                                Unjust Enrichment

¶ 59    Shavers's second amended complaint pleads that defendants, including TUPSS, retained a significant monetary benefit by charging excessive notary fees at her expense and the expense of the putative plaintiff class. A claim for unjust enrichment occurs when the defendant unjustly retains a benefit to the plaintiff's detriment in violation of the fundamental principles of justice, equity, and good conscience. *Stefanski v. City of Chicago*, 2015 IL App (1st) 132844, ¶47. Without the Notary Act claim, the unjust enrichment claim here stands or falls depending on what happens to the ICFA claim. *Mulligan v. QVC, Inc.,* 382 Ill. App. 3d 620, 631(2008) (unjust enrichment cannot be pleaded as cause of action on own). Because I would reverse the dismissal of the ICFA claim, the unjust enrichment claim survives as well.